**LOWER COLORADO RIVER AUTHORITY
v. CHEMICAL BANK & TRUST CO.
et al.**

No. 9474.

Court of Civil Appeals of Texas. Austin.
Jan. 3, 1945.

Rehearing Denied Jan. 24, 1945.

Powell, Wirtz, Rauhut, & Gideon, of Austin, for appellant and appellee Lower Colorado River Authority.

Hart & Brown and James P. Hart, all of Austin, for appellant Chemical Bank & Trust Co., trustee.

Goldsmith & Bagby, of Austin, for appellant and appellee American Nat. Bank of Austin, Tex., co-trustee.

Albert DeLange, of Houston, for Housing Authority of City of Houston, Tex., Geo. R. Thomson, of San Antonio, for Housing Authority of City of San Antonio, Tex., R. G. Scurry, of Dallas, for Housing Authority of City of Dallas, Tex., and A. J. Thuss, of Dallas, City Atty. of Dallas, Tex., amici curiae.

BAUGH, Justice.

Suit by Lower Colorado River Authority, hereafter referred to as LCRA, or the Authority, against Chemical Bank & Trust Company of New York, as trustee, American National Bank of Austin, Texas, as cotrustee, and the Attorney General of Texas, for a declaratory judgment and to test the constitutionality of Art. 7150, subd. 4a, Vernon's Ann.Civ.St., as amended. On May 1, 1943, the LCRA entered into a comprehensive trust indenture with the named trustee and cotrustee, prescribing the duties of the board of directors of the Authority, and those of the trustee and cotrustee thereunder. This indenture was designed primarily to secure and provide the method of payment, principal and interest, of $21,-635,000 in revenue bonds theretofore issued by the Authority and sold to the public. These bonds were unregistered, interest coupon bonds, payable to bearer, are held by more than one thousand owners throughout the United States, and mature semi-annually in designated amounts from 1944 to 1975. The trust indenture conforms with the law creating the Authority. Acts 43rd Leg., 4th C.S., 1934, Ch. 7, p. 19, Vernon's Ann.Civ.St. following art. 8197f. It provided for several different funds in the hands of the trustee and cotrustee, segregated for special purposes, among others, a Debt Service Reserve. Under an indenture executed in 1939, superseded by the one here involved, $1,000,000 of the funds of the Debt Service Reserve had been invested in U. S. Treasury Certificates bearing $7/8\%$ interest. These had been turned over to the trustee, under the trust indenture of May 1, 1943, along with $63,-023.07, as composing a Debt Service Reserve of the Authority. In September 1943, the Board of Directors of the Authority authorized and requested the trustee to sell these Treasury Certificates and reinvest the proceeds therefrom in 2% U. S. Treasury bonds. This the trustee de-

clined to do on the ground that the trust indenture authorized the investment only of "any moneys" in said fund; that Treasury Certificates were not moneys; and that sale of securities for the purpose of reinvestment in other securities was not authorized by the trust indenture. The trial court decided to the contrary and from this portion of the judgment Chemical Bank & Trust Company has appealed.

By plea in abatement the Chemical Bank & Trust Company and the American National Bank of Austin, urged that the bondholders, none of whom were made parties, were necessary parties to the suit. The trial court overruled this plea in abatement, from which said trustee and cotrustee have also appealed.

The Board of Directors of the Authority also undertook to set up a pension or retirement plan for its officers and employees by increasing their compensation 4% and setting aside this 4% for that purpose. The American National Bank denied its authority under the law to do so. The trial court held that the Authority had such power; and from this portion of the judgment the American National Bank, cotrustee under the indenture, has appealed.

Pursuant to the provisions of Sec. 4a of Art. 7150, Vernon's Ann.Civ.St., Acts 1943, 48 Leg., p. 472, Ch. 316, Sec. 1, the Board of Directors of the Authority authorized and directed the payment out of funds of the Authority, in lieu of taxes, of the sums provided, and to the taxing units prescribed, in said statute. The American National Bank, custodian of the Authority's funds, denied the Authority's right to do so on the ground that the Act requiring such payments was unconstitutional and void. The trial court so held, and from this portion of the judgment the LCRA has appealed.

Under the indenture of May 1, 1943, the American National Bank, cotrustee, was made the depository of the "Revenue Fund" and the "Contingency Fund" of the Authority. As such it was required by the Authority to secure such deposits by pledge of U. S. obligations of at least equal value to the amount of such deposits. The American National Bank sought a declaratory judgment that such funds were not public funds and consequently were not required by law to be secured by such pledges. The trial court held that such funds did constitute public moneys of a political subdivsion of the State and could be properly secured by such pledges. From this portion of the judgment the American National Bank has appealed.

Thus all parties to the suit (except the Attorney General who did not participate) are both appellant and appellee herein.

We consider the issues presented in the order above stated.

First. Could the Board of Directors, under the terms of the trust indenture, require the trustee, Chemical Bank & Trust Co., to sell the U. S. ⅞% Treasury Certificates, constituting a part of the Debt Service Reserve, and reinvest the proceeds therefrom in U. S. bonds bearing a higher rate of interest than the Treasury Certificates?

The pertinent provisions of Art. Six, Sec. 6.01 of the trust indenture relating to the matter reads: "Whenever there shall be delivered to the Trustee a resolution of the Board of Directors of the Authority, certified by the Secretary or an Assistant Secretary of the Authority under its corporate seal to have been duly adopted and to be in full force and effect, authorizing and requesting the Trustee so to do, the Trustee shall, if then permitted by applicable laws, invest any moneys then in the Debt Service Reserve, not required or permitted under the terms of this Indenture to be applied within the next succeeding six (6) calendar months to the payment of the principal of or the interest on or to the purchase or redemption of any Bonds, in securities constituting direct obligations of the United States of America, and all such securities from time to time purchased shall be held as a part of the Debt Service Reserve. If and when from time to time the cash invested in such securities shall be required for the purposes of the Debt Service Reserve, the Trustee shall sell such securities, or such portion thereof as may be necessary to produce the cash then required, in the open market at the best price or prices obtainable, and the proceeds of such securities shall constitute a part of the Debt Service Reserve in the same manner as the moneys originally deposited therein. All interest from time to time received by the Trustee in respect of any such securities shall likewise constitute a part of the Debt Service Reserve. The Trustee shall not be responsible to the Authority or to the Bondholders for any loss arising out of the sale of any such securities at any time constituting a part of the Debt Service Reserve. Unless other-

wise specifically instructed in and by such resolution, the Trustee shall exercise its discretion as to the maturities and interest rates of the securities to be purchased. For the purpose of determining the amount of moneys in the Debt Service Reserve at any time, such securities shall be valued in accordance with current quotations in any market in which such securities shall be traded."

As above stated, the trustee contends that the term "any moneys" as used in the indenture means only cash, and that since sale of securities for reinvestment in other U. S. securities is not expressly authorized, it had no authority to do so. The trustee cites us to numerous authorities relating to trusts generally defining the powers, and limitations thereon, of trustees generally, which, in general, lay down the rule that as to the trust estate, the trustee can exercise only such powers as are expressly granted by the settlor, or those necessarily implied in the trust instrument as necessary to effectuate its purposes. See 1 Perry "Trusts and Trustees," Sec. 459; Sec. 190 Restatement of the Law of Trusts; Haldeman v. Openheimer, 103 Tex. 275, 126 S.W. 566; Mansfield v. Wardlow, Tex.Civ.App., 91 S.W. 859, writ refused; 42 Tex.Jur., Sec. 98, p. 713; 65 C.J., § 596, p. 732, § 697, p. 815. Such rules are deduced, however, primarily from instances, where the settlor has no control over the trust estate, but same has been vested in the trustee for the benefit of named beneficiaries. The most common being trusts created by deed or by will. It is equally well settled, however, that the creator of the trust can reserve to himself any power which he desires with respect to the trust property, so long as such power is not illegal. West Texas Bank & Trust Co. v. Matlock, Tex.Com.App., 212 S.W. 937; Johnson v. Snaman, Tex. Civ.App., 76 S.W.2d 824, writ refused; Restatement of the Law of Trusts, Sec. 37. The question here presented is not what powers the trustee, acting on its own volition under the trust indenture, could and should exercise; but whether the LCRA, settlor of the trust, has reserved to itself, under the trust indenture, the power and authority to direct and require the trustee to act in the particular manner here involved. We have concluded that it has, and that the trial court properly so held.

As stated, the trust indenture is very comprehensive, consisting of 96 printed pages. In it the Board of Directors of the Authority reserve and retain complete control over the operation and management of the properties and facilities of the Authority with certain powers of sale and the right to acquire other properties, make extensions, etc. Four funds are set up by the indenture, all of which are created from the income derived from the operation of the Authority. These are: 1. The Revenue Fund; 2. The Debt Service Fund; 3. The Debt Service Reserve; and 4. The Contingency Fund. The cotrustee, American National Bank, is the original depository of the Revenue Fund. Out of that fund the Authority first pays all reasonable, proper and necessary operating expenses of the "System", and, under prescribed conditions, also extraordinary maintenance, e. g. cost of construction or acquisition of additions, reconstruction, repairs, replacements, etc. Then out of the moneys remaining in the Revenue Fund, there is set up with the trustee the Debt Service Fund used primarily to pay maturing bonds and interest on outstanding bonds of the Authority. Moneys then remaining in the Revenue Fund are transferred 60% to the trustee for credit to the Debt Service Reserve; and 40% to the Contingency Fund, held by the cotrustee. In no event is the amount of the Debt Service Reserve to exceed the amount needed during the next succeeding 18 months to pay maturing bonds and interest.

Obviously the Authority contemplated that in the future there might be lean years in the income from its operation, or other unforeseen contingencies, in which the net annual returns from its operations might not be sufficient to pay maturing bonds and interest, and so provided the Debt Service Reserve which is to be resorted to only in the event the Debt Service Fund is not sufficient for that purpose; and then only in the amount needed to supplement the Debt Service Fund sufficient to pay such obligations then maturing. If and when the Debt Service Reserve exceeds the amount needed to liquidate the bond obligations maturing in the next succeeding 18 months, then the excess, if as much as $25,000 is to be used to redeem outstanding bonds if the Authority elects to do so. Art. 8 of the indenture also gives the Authority, at its election, the right to re-

deem all or any part of the bonds outstanding, under the terms stated in that Article, the same obligations which the Debt Service Reserve is created solely to secure. It is to be noted also that the trustee is not given the power of its own accord to invest the cash in this Debt Service Reserve in U. S. obligations, but only when authorized to do so by the Board of Directors of the Authority; and is given authority to sell them, without further authority from such Board, only when additional cash is needed in that fund. The Board also, in the above-quoted portion of the trust indenture, reserves the right to direct the trustee what character of U. S. securities should be purchased by it.

The fund in question being therefore strictly a reserve fund, as to a portion of which the settlor, LCRA, has retained the right, as it sees fit, to direct the trustee to invest in such U. S. securities as it may choose; and in the sale of which the trustee is exonerated from any loss resulting from such sale; so long as the Authority acts in good faith, does not jeopardize the security to the bondholders provided by such Debt Service Reserve, and confines the investment to the securities designated in the trust indenture, we think the Board of Directors of the Authority had the right in its discretion to direct the sale of U. S. securities bearing only 7/8% interest and the reinvestment of the proceeds thereof in other direct obligations of the United States bearing a higher rate of interest. There is no intimation that by such sale and reinvestment the Debt Service Reserve, none of which was needed for other purposes, would suffer any loss.

We do not understand it to be seriously contended that the term "moneys" as used in the quoted portion of the indenture means only cash. Not only is the term used to denote both cash and securities in other portions of the indenture, but in the last sentence of the quoted provision it is clearly indicated that both cash and securities are included in the term "moneys" as applied to the Debt Service Reserve.

The next question presented is whether the bondholders, or at least some of them as representative of the class, were necessary parties to this suit.

It is a well-settled rule that in general the beneficiaries of a trust are proper, and usually necessary, parties to suits relating to the trust estate. This is particularly true as to specifically named beneficiaries. See 42 Tex.Jur., Sec. 157, p. 778, and cases cited; 65 C.J., § 759, p. 869; Powell v. Parks, 126 Tex. 338, 86 S.W.2d 725. Or where the purpose of the suit is to modify, alter or end the trust. Republic National Bank & Trust Co. v. Bruce, 130 Tex. 136, 105 S.W.2d 882. However there are certain well-defined exceptions to this rule under which the instant case comes. In instances wherein, by the terms of the trust, or from the nature of the suit, the trustee represents the beneficiaries; "or where the beneficiaries are so numerous as to make it difficult or impracticable to make them all parties, or where the relief sought in no wise affects the relations of the trustee with them," beneficiaries are not necessary parties. 65 C.J., § 759, p. 870; 42 Tex. Jur., Sec. 158, p. 779; City of Austin v. Cahill, 99 Tex. 172, 88 S.W. 542. The bonds secured by the trust indenture were negotiable bearer bonds held by numerous owners throughout the United States and neither the Authority nor the trustees had any way of knowing who they were except as and when the maturing bonds and interest coupons were presented for payment. There was no conflict of interest either between the trustees and the beneficiaries or between the beneficiaries themselves. All of the bondholders, except as to time of payment and order of redemption, in case the Authority chose to redeem them, were in the same category and entitled to the same rights. The protection of those rights was vested in the trustees so far as the funds coming into their hands were concerned. The trustees were charged by the trust indenture with that duty. This suit was not to modify, alter nor terminate the trust; but purely to construe it in the interest, not only of the parties to the indenture, but of the beneficiaries thereunder as well. While the indenture did not in express terms authorize the trustees to exclusively represent the bondholders in this particular character of suit, such was, we think, its clear intent. Nowhere does the indenture give the bondholders any unconditional right to sue; but under certain circumstances they may require the trustees to do so. The trustee is given the right to sue for any insurance moneys due and payable to the trustee. It may by suit compel the Authority to charge, collect

and pay over adequate rates. It may employ counsel to advise it as to its rights and duties. Though Article 11 relates to defaults, the trustees are given broad powers to sue thereunder without being joined by bondholders, or without possession of any of the bonds, and the judgment recovered in the name of such trustee inures to the equal benefit of all bondholders. In so far as any claims of the bondholders are concerned the indenture makes the trustees the "true and lawful attorneys in fact" for all bondholders to do and perform any and all acts by them deemed necessary and advisable. Sec. 11.10 of that Article provides: "All rights of action in respect of this Indenture shall be exercised only by the Trustees and no holder of any bond issued hereunder shall have any right to institute any suit, action or proceeding in law or in equity for the appointment of a receiver *or for any other remedy hereunder or by reason hereof * * *,*" (Italics ours.) unless and until such trustees have refused, after written request from at least 25% of the bondholders, to file such suit. While this provision relates primarily to defaults, it manifests, when considered with other provisions of the indenture, a clear intent, we think, that the trustees are to act for and represent the bondholders in all such matters; and that such bondholders are not necessary parties in the instant suit.

█ The third, fourth and fifth points are presented by the cotrustee, American National Bank. The third contention is that the Board of Directors of the LCRA has no statutory authority to establish a pension plan for its officers and employees, and no lawful authority to pay the expenses of same out of the Revenue Fund created by the Trust Indenture. This on the grounds that under the rule applicable to municipal corporations generally, in the absence of express authority to provide such pension system, the LCRA has power to do only what is "indispensable for the discharge of its duties and the purposes of its corporate existence" (Foster v. City of Waco, 113 Tex. 352, 255 S.W. 1104; 30 Tex.Jur., Sec. 46, p. 97; idem Sec. 50, p. 108; 37 Am.Jur., Sec. 112, p. 722); that absent express power, the doctrine of "Expressio unius exclusio alterius" applies (Red River Nat. Bank v. Ferguson, 109 Tex. 287, 206 S.W. 923; 39 Tex.Jur., Sec. 100, p. 190); that if there be any doubt as to the existence of the power it will be resolved against the Authority (Foster v. City of Waco, supra; Texas-Louisiana Power Co. v. Farmersville, Tex.Com.App., 67 S.W.2d 235); and that the rule of strict construction applies. 30 Tex.Jur., Sec. 52, p. 110, and cases cited. Such latter rule applies, however, only to the grant of the power in question. If the power exist, and the mode of its exercise is not limited by the Legislature, a generous measure of its exercise will be permitted. West v. City of Waco, 116 Tex. 472, 294 S.W. 832; 37 Am.Jur., Sec. 113, p. 726.

█ The LCRA is "a governmental agency and body politic and corporate" under and by virtue of the law creating it. Lower Colorado River Authority v. McCraw, 125 Tex. 268, 83 S.W.2d 629, 630. In addition the rights and powers granted by general laws to districts created under Art. XVI, Sec. 59a of the Constitution of Texas, Vernon's Ann.St., and without limitation thereon, the Act provides that the powers, rights, privileges and functions of the District shall be exercised by its Board of Directors, who have the powers, among other things, to construct, extend, maintain, use and operate "any and all facilities of any kind necessary or convenient to the exercise of such powers, rights, privileges and functions"; "to make by-laws for the management and regulation of its affairs"; "to appoint officers, agents and employees, to prescribe their duties and to fix their compensation"; "to make contracts and to execute instruments necessary or convenient to the exercise of the powers, rights, privileges and functions conferred"; "to do any and all other acts or things necessary or convenient to the exercise of the powers" etc. conferred by the Act; to determine how the moneys of the Authority shall be disbursed; and to fix rates so as to "pay all expenses necessary to the operation and maintenance of the properties and facilities" of the Authority. And Sec. 18 of said Act provides that "This Act and all of the terms and provisions hereof shall be liberally construed to effectuate the purposes set forth herein."

The Trust Indenture also provides for costs of operation of the Authority's properties; and that the Board in appointing officers and employees and prescribing their duties shall "fix their compensation in an amount sufficient to obtain the services of competent and efficient persons in such positions."

In accordance with the opinion of the General Manager of the Authority, based upon years of experience in such field, that a retirement plan for the benefit of employees would result in less employment turn-over, better service from employees, and less ultimate cost to the Authority; the Board, by resolution, authorized a 4% increase in pay, to be set aside, together with contributions from the officers and employees for that purpose, to provide a pension or retirement plan.

So far as a strict construction of the provisions of the Act creating the Authority, and the powers therein conferred upon the Authority, is concerned, the express language of the Act itself is to the contrary. Not only is that true but both under the terms of the Act and of the Trust Indenture, the appointment and payment of the officers and employees are matters vested in the sound discretion of the Board of Directors and chargeable as costs of operation. While designated and classified as a governmental agency and body politic and corporate, the Authority's functions and activities partake in large measure the nature and characteristics, within legislative restrictions, of a large industrial enterprise, rather than of a strictly governmental function. It has no power to levy taxes, enact laws nor ordinances, as a city has; and its efficient functioning depends in large measure on the sound judgment and good business management of its Board of Directors. They have large control over the operation of its properties, and the income to be derived therefrom, which constitute the only source of revenue to meet its obligations. Of necessity matters relating thereto must be left in large measure to their judgment, experience and discretion; and obviously could not be prescribed in detail by law.

It is not contended that the Board did not have the authority, in their discretion, to increase the pay of its employees 4% and pay all of such increase direct to said employees. The power to adjust such payments is clearly given; and the question here presented is, we think, merely one of the proper exercise of a power given, as to which liberal rules of construction apply. Any action or plan, relating wholly to payment of employees as part of the cost of operation of the Authority, based upon experience and sound business judgment, and absent any fraud or abuse of discretion, which will contribute to a more efficient and economic operation of the Authority's facilities and properties, would clearly, we think, be authorized as an operating expense and payable out of the Revenue Fund. Retirement pay from funds accumulated through the co-operative efforts of employer and employee are now well-established business practices among practically all large industrial enterprises; and are being increasingly applied by national, state and municipal governments. Typical instances are civil service employees, postal employees, fire and police employees, etc. Such payments do not constitute gratuities, but are grounded on mutual benefits, conducive to continuity of tenure, increased efficiency through continuing employment, loyalty of employees, security of jobs and fidelity to duty. They afford not only an incentive to the employee to retain his job but in the end result in economy to the employer. Upon the same considerations group insurance, hospitalization for employees, etc., payable out of public funds have been sustained. Byrd v. City of Dallas, 118 Tex. 28, 6 S. W.2d 738; Boseman v. Connecticut Gen. Life Ins. Co., 301 U.S. 196, 57 S.Ct 686, 81 L.Ed. 1036, 110 A.L.R. 732; State v. City of Memphis, 147 Tenn. 658, 251 S.W. 46, 27 A.L.R. 1257; Nohl v. Board of Education, 27 N.M. 232, 199 P. 373, 16 A.L.R. 1085.

No question of bad faith nor abuse of discretion by the Board is presented. The matter of payment of officers and employees was one vested entirely in the discretion of the Board. The issue presented is but a modification, in effect, of the method of payment, which, in the opinion of the Board would lessen employee turnover, obtain more efficient service, and lessen ultimate costs of operation, a matter they were not only given authority to determine, but which it was their duty to determine.

The fourth point urges that the moneys of the Authority deposited by it with the cotrustee are not public moneys under the terms of the Trust Indenture, and cannot be lawfully secured by a pledge of a portion of the bank's assets.

The two funds of the Authority kept on deposit with the cotrustee were the Revenue Fund, out of which operating expenses were paid, and the Contingency Fund, out of which expansions, acquisition of new properties, etc., were paid. The other

funds,—Debt Service and Debt Service Reserve—were deposited with the trustee in New York. It is not contended that the cotrustee was compelled by law to secure such deposits. It had done so by agreement with the Authority, and the issue is whether it could legally make such agreement. This, in turn, depends upon whether the Authority is an agency or instrumentality of the State and whether such funds are "public money". The National Banking Act, 12 U.S.C.A. § 90, authorizes national banks to secure deposits "of a State or any political subdivision thereof," where the law of the State in which such bank is located authorizes the pledge of securities by other banking institutions. The Texas law authorizes such pledge of assets to secure deposits of or by the United States Government, the State of Texas, or any agency or instrumentality of either. Acts 1943, 48th Leg. p. 152, Ch. 97, Sub. VI, Art. 3, Vernon's Ann.Civ.St. art. 342—603.

That the Authority is an agency or instrumentality of the State was determined by the Supreme Court in Lower Colorado River Authority v. McCraw, 125 Tex. 268, 83 S.W.2d 629. That the funds deposited by it, to be used only for a public purpose, and subject to expenditure by the Authority only for such purpose, are public funds is not, we think, subject to doubt. The funds of such districts whether raised by taxation or by operation of the "System" are intrinsically so. 50 C.J., § 40, p. 854; 42 Am.Jur., Sec. 2, p. 718; Fairless v. Cameron County Water Dist. No. 1, Tex.Civ.App., 25 S.W.2d 651; United States Fidelity & Guaranty Co. v. Sunflower County, 194 Miss. 680, 12 So.2d 142. It is too clear for argument, we think, that such funds did not, as urged by the cotrustee, belong to the bondholders as beneficiaries. They were not set aside, under the Trust Indenture, for the payment of outstanding bonds and interest thereon. The Debt Service Fund and Debt Service Reserve were specifically set aside in the hands of the trustee in New York for that purpose, over which the cotrustee exercised no control. Being public funds the pledge of such securities by the cotrustee to secure the deposit thereof was clearly authorized by both State and Federal laws.

The last question presented is the constitutionality of Art. 7150, subd. 4a, Vernon's Ann.Civ.St., as amended (Acts 1943, 48th Leg., p. 472, Ch. 316, Sec. 1). It is not necessary to set out that Act in full. In substance it makes it the mandatory duty of such Districts where they have heretofore acquired, or may hereafter acquire, plants or properties being used to generate, transmit or distribute electric power, and which had theretofore been assessed by, and had paid ad valorem taxes to, the taxing units in which they were located; to pay, out of the revenues of the District or Authority, the sums of money and at the times provided in the Act. While designated as payments in lieu of taxes, the amounts and times of payment were made the same as if such properties had not been acquired by the Authority, but had remained on the tax rolls of the taxing unit, whether state, county, city or other taxing district. The payment was made mandatory and was made a lien upon the revenues of the district.

It is not controverted that such levy constitutes a tax upon the properties of the Authority. Though designated as payments "in lieu of taxes" the other express terms of the Act clearly make it a tax. Such is its import and effect.

It is urged that this statute contravenes the constitution of Texas in four respects:

1. In that it undertakes to tax "property devoted exclusively to the use and benefit of the public" exempted from taxation by Art. XI, Sec. 9 of the Constitution, Vernon's Ann.St.

2. That such property of the Authority is "municipal" property, within the meaning of Art. VIII, Sec. 1, of the Constitution, and therefore exempt as such.

3. That such levy would impair the obligations of the contracts of the Authority (its outstanding bonds) in violation of both State and Federal Constitutions, for the reason that the Authority had issued and sold $22,000,000 in bonds prior to the passage of such taxing Act; and had pledged all of its revenues to pay same, under the pledge and agreement of the State in the law creating the Authority, that it would not in any way impair said bonds.

4. That it violates the equal and uniform tax provisions of the Constitution in that it does not require other types of municipal corporations to pay such taxes on the same character of property used for the same purposes.

We are so fully convinced that the Act contravenes Sec. 9 of Art. XI that

we deem it unnecessary to discuss at length the other grounds presented.

Art. VIII, Sec. 2, of the Constitution, among other things, authorizes the Legislature to exempt from taxation certain kinds of property therein described. Art. 7150, Vernon's Ann.Civ.St., does so as to numerous classes of property; and prior to the passage of the Act here involved, Sec. 4 of Art. 7150, exempted all property of the State or any political subdivision thereof. For the purposes of this decision it may be conceded that the State has the power to tax public property except as otherwise forbidden to do so by the Constitution itself. However, Sec. 9 of Art. XI expressly exempts from taxation the property of "counties, cities and towns, owned and held only for public purposes, * * * and all other property devoted exclusively to the use and benefit of the public, * * *." If the properties of the LCRA sought to be taxed by Art. 7150, subd. 4a, come under such provision, then they are exempt from taxation by the Constitution itself. We think that they do.

Art. XVI, Sec. 59a, under which the Authority was created declares that the functions of such districts are public rights and duties; and that such districts shall be governmental agencies and bodies politic and corporate. In Lower Colorado River Authority v. McCraw, supra, the Supreme Court held that the Act creating the Authority "operates upon a subject that the [state] at large [is] interested in" and that its powers and functions were not confined strictly to its territorial limits. Its bonds were expressly exempted from taxation. While the Authority is not given taxing power, and its properties not subjected to any liens, and to that extent it differs generally from such water districts created under Art. XVI, Sec. 59a, its purposes and duties are wholly public within the terms of the conservation amendment to the Constitution. It can earn no profit for the use and benefit of any one. Though it operates in a limited sense on the nature of a quasi industrial organization, if, at the end of any operating year, its income exceed the amounts required for operating expenses, extensions, replacements, bond obligations, reserves, etc., such excess is applied to the liquidation of its debts, redemption of its unmatured bonds, and results in reduction of the rates of its services to the public,—in brief, to the benefit of the public. It follows, we think, that its properties are "devoted exclusively to the use and benefit of the public" and are therefore exempt from taxation.

The Act creating the Authority provides (Sec. 2) that "Except as expressly limited by this Act" the Authority is given all the powers, rights, etc., conferred by general law on "any District or Districts" created under the Conservation Amendment to the Constitution; thus indicating a legislative intent to place them in the same general classification. Such other water districts have been held to be municipal corporations whose properties are exempt from taxation. Bexar-Medina-Atascosa Water Imp. Dist. No. 1 v. State, Tex.Civ.App., 21 S.W.2d 747, writ refused. See also Brazos River Con. and Rec. Dist. v. McCraw, 126 Tex. 506, 91 S.W.2d 665; Corporation of San Felipe de Austin v. State, 111 Tex. 108, 229 S.W. 845.

We conclude, therefore, that the trial court properly held that the provisions of the Act in question were but a tax upon the properties of the Authority, exempt from taxation by the Constitution, and as such it is void.

The attorneys for the Housing Authorities of Houston, San Antonio and Dallas have filed an amicus curiae brief calling attention to the distinction between the provisions of Art. 7150, subd. 4a, Vernon's Ann.Civ.St., and of Art. 1269k—22, Vernon's Ann.Civ.St. (Acts 1937, 45th Leg., p. 1144, Ch. 462; Acts 1937, 45th Leg., 2nd C.S., p. 1924, Ch. 41, Sec. 1) relating to payments by Housing Authorities in lieu of taxes. The provisions of the two Acts are entirely different and relate to entirely different subjects. What has been said above relates only to Art. 7150, subd. 4a applicable to water districts created under Art. XVI, Sec. 59 of the Constitution; and the provisions of the Housing Authorities Law have no application to the issue here presented.

It follows from the conclusions above announced that the trial court's judgment should be affirmed, and it is so ordered.

Affirmed.