SAN ANTONIO BUILDING & CONSTRUCTION TRADES COUNCIL, Tim McGrath, and Bob Salvatore, Appellants,

v.

CITY OF SAN ANTONIO, Appellee.

No. 04–05–00675–CV.

Court of Appeals of Texas, San Antonio.

Feb. 21, 2007.

David Van Os, Matt Holder, David Van Os & Associates, P.C., Heidi L. Widell, Law Office of Heidi L. Widell, San Antonio for appellants.

Ricardo R. Reyna, Randall L. Alwais, Brock & Person, P.C., San Antonio, for appellee.

Sitting: CATHERINE STONE, Justice KAREN ANGELINI, Justice REBECCA SIMMONS, Justice.

## OPINION

Opinion by KAREN ANGELINI, Justice.

At issue in this appeal is whether chapter 2258 of the Texas Government Code requires construction workers working on the convention center hotel project in San Antonio, Texas to be paid prevailing wages. Because we hold that chapter 2258 does not apply to the project, we affirm the judgment of the trial court.

### BACKGROUND

The underlying action stems from the development of land owned by the City of San Antonio adjoining the Henry B. Gonzalez Convention Center. In February 2003, the City Council established the Convention Center Hotel Advisory Board ("Advisory Board"), which is composed of "seven local experts from the Finance/Banking, Real Estate/Corporate, and Hotel/Tourism business sectors as well as a community representative." In May 2004, the Advisory Board and HVS International, an independent consulting firm, determined that a convention center hotel was important to maintain and expand San Antonio's convention industry. In a written report, the Advisory Board recommended that the City's land be developed by building such a hotel. In doing so, it recommended that a private developer construct, own, and operate the convention center hotel. However, the Advisory Board warned that a private developer would have difficulty obtaining "conventional hotel financing" for the project and that "some form of municipal or non-profit debt financing [would] be required to bridge the gap between financing provided by the developer and total construction costs to ensure development."

Through an ordinance, the City approved the request and application of Hotel Investments, L.P. ("the Developer") to design, construct, and operate the convention center hotel. *See* Ordinance No. 100686. As such, on June 8, 2005, the City and the Developer entered into the "Project Agreement," which incorporated a "Ground Lease and License Agreement." Under this Ground Lease, the Developer (the "tenant") leased from the City (the "landlord") the "Leased Premises" for an initial term of seventy-five years with an option to extend the term for an additional fifteen years. "Leased Premises" was defined by section 2.1 of the Ground Lease:

For good and valuable consideration, Landlord agrees to and does hereby

lease, let and demise to Tenant, and Tenant agrees to and does hereby receive and lease from Landlord, on and subject to the terms, conditions, and provisions of this Ground Lease, the Site and, subject to Tenant's obligation to perform the Demolition Work in accordance with the Project Agreement, the Existing Improvements located on the Site (collectively, the "Leased Premises") for the Lease Term.

Minimum standards for the convention center hotel were also incorporated into the Project Agreement through the incorporation of the Ground Lease. According to the Ground Lease, during the lease term, title to all "Project Improvements constructed on the Premises" shall remain in the tenant (the Developer); however, upon expiration of the lease, title to all "Project Improvements" will "automatically" "vest in Landlord [the City] without the payment of any compensation therefor. . . ."

The Developer provided $77,331,200.00 of cash and capital contributions for construction of the convention center hotel and sought lower-cost/tax-free bonds to finance the remaining costs of $230,000,000.00. Pursuant to chapter 431 of the Texas Transportation Code,[1] the City Council created the City of San Antonio, Texas Convention Center Hotel Finance Corporation ("the nonprofit corporation"),[2] a Texas nonprofit local government corporation, "for the purpose of financing a portion of the costs required to construct, furnish and equip a privately-owned hotel to be located on land owned by the City that is adjacent to the City's Convention Center in order to promote economic development and to stimulate business and commercial activity in the City, all at the request of the City Council of the City." Ordinance No. 100685. Thus, the City Council created the nonprofit corporation so that it could issue Series 2005A Tax–Exempt Empowerment Zone Bonds totaling up to $130,000,000.00 and Series 2005B Taxable Revenue Bonds totaling up to $100,000,000.00.

The empowerment zone revenue bonds were issued pursuant to Internal Revenue Code Subtitle A, Chapter 1, Subchapter U, which permits municipalities in economically depressed and/or disadvantaged areas to issue tax-free bonds for the benefit of private enterprises. See 26 U.S.C. § 1391 et seq. The proceeds of the bonds were loaned to the Developer. Pursuant to the Loan Agreement between the nonprofit corporation and the Developer and the Indenture of Trust between the nonprofit corporation and Wells Fargo Bank, N.A., the Developer is responsible for repayment, interest, and financing costs of the revenue bonds. And, the Developer assigned an interest in its net operating revenue to the nonprofit corporation and Wells Fargo Bank to secure the Developer's obligations. Further, the bonds expressly state that they are not a general debt or an obligation of the City, the State of Texas, or any political subdivision of the State.

The San Antonio Building and Construction Trades Council ("SABTC"), Tim McGrath (the representative officer of Sheet Metal Workers International Association Local No. 67, a labor union affiliated with SABTC), and Bob Salvatore (president of SABTC) (collectively "the SABTC

---

1. Section 431.101 of the Texas Transportation Code allows a local government to create a nonprofit local government corporation. See TEX. TRANSP. CODE ANN. § 431.101 (Vernon Supp.2006).

2. The Board of Directors of the nonprofit corporation is composed of the members of City Council.

Plaintiffs") filed suit for declaratory judgment against the City of San Antonio, alleging that chapter 2258 of the Texas Government Code requires construction workers working on the convention center hotel project to be paid prevailing wages.

On June 2, 2005, the case was tried to the bench. No witnesses testified. Instead, through agreement and stipulation by the parties, the documents at issue were admitted in evidence as exhibits. In its findings of fact and conclusions of law, the trial court found that the convention center hotel project was a "public work," but that "no 'public funds' [were] used in whole or in part to pay for the construction" of the hotel. Because public funds were not used, the trial court determined that the City was not required to pay the "prevailing wage rate" "to any employee, contractor, or employee of a contractor relating to the development, design, construction, management, or maintenance of a convention center hotel facility." Thus, the trial court rendered judgment in favor of the City.

On appeal, the SABTC Plaintiffs bring two issues: (1) whether the convention center hotel project is a "public work" requiring application of chapter 2258 of the Government Code without regard to whether the project was financed in whole or in part by public funds; and (2) whether the funds raised from the bonds loaned to the Developer for the construction of the project are "public funds." The City, in turn, raises two cross-issues on appeal: (1) whether the SABTC Plaintiffs have standing to assert their claims; and (2) whether the trial court erred in determining that the convention center hotel project was a "public work."

## STANDING

The City of San Antonio argues that we do not have subject-matter jurisdiction because the SABTC Plaintiffs failed to plead or prove standing sufficient to confer subject-matter jurisdiction.

Standing is a component of subject-matter jurisdiction. *Waco Indep. Sch. Dist. v. Gibson,* 22 S.W.3d 849, 850 (Tex. 2000); *Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 445 (Tex.1993). As such, it cannot be waived and can be raised for the first time on appeal. *Waco Indep. Sch. Dist.,* 22 S.W.3d at 850; *Tex. Ass'n of Bus.,* 852 S.W.2d at 443–44. Here, there is nothing in the record to indicate that the trial court ruled on whether the SABTC plaintiffs had standing;[3] thus, we are not reviewing a trial court's order of dismissal for want of jurisdiction. Instead, we are considering standing for the first time on appeal, and doing so, we must construe the SABTC Plaintiffs' petition in their favor and review the entire record in considering whether any evidence supports standing:

A review of only the pleadings to determine subject matter jurisdiction is sufficient in the trial court because a litigant has a right to amend to attempt to cure pleading defects if jurisdictional facts are not alleged. Failing that, the suit is dismissed. When an appellate court questions jurisdiction on appeal for the first time, however, there is no opportunity to cure the defect. Therefore, when a Texas appellate court reviews the standing of a party sua sponte, it must construe the petition in favor of the party, and if necessary, review the

**3.** We note that in a post-submission letter, appellants' attorney states that "[i]n reviewing the pleadings below, the undersigned finds and recalls that the City did challenge the SABTC's associational standing." However, the appellate record does not reflect and neither party indicates whether the trial court ever ruled on this "challenge."

entire record to determine if any evidence supports standing.

*Tex. Ass'n of Bus.*, 852 S.W.2d at 446 (citation omitted).

■ The general test for standing in Texas requires that there be a real controversy between the parties, which will actually be determined by the judicial declaration sought. *Id.* Even though there is not a real controversy between the City and the SABTC Plaintiffs, the SABTC Plaintiffs argue that they have standing because SABTC is a labor organization. For support, they cite to an opinion decided in 1950 by the Austin Court of Appeals: *El Paso Building & Construction Trades Council v. Texas Highway Commission*, 231 S.W.2d 533 (Tex.Civ.App.-Austin), *rev'd on other grounds*, 149 Tex. 457, 234 S.W.2d 857 (1950). In that case, the plaintiff, El Paso Building and Construction Trades Council sought a declaratory judgment that the Texas Highway Commission's "prevailing wage rate determination in and for El Paso County was substandard, unlawful, and void" and asked the court to issue an injunction "requiring defendants to reconsider and redetermine prevailing wage rates in the El Paso locality." *Id.* at 534. The plaintiff alleged that "it is a party to written collective bargaining contracts or oral wage agreements with 93 contractors and subcontractors employing 2,470 workers in the contract construction industry in the El Paso locality." *Id.* at 535. Plaintiff also alleged that "as the mouthpiece of the laboring man in this industry in the El Paso locality, [it] has intense interest in the preservation and improvement of wage standards." *Id.* The Austin Court of Appeals held that the plaintiff had standing to bring suit:

> The purpose of the enactment of the law was for the benefit of labor and to prevent the beating down of wages to a level far below that required to maintain a laborer, workman or mechanic in reasonable circumstances.

We believe that the plaintiff, El Paso Building and Construction Trades Council, seeking to be the mouthpiece for union labor in the El Paso locality, has a sufficient interest in the subject matter to enable it to institute and maintain the proceedings in the instant case.

We think the intention is clearly apparent from the terms of the contract, relating to the rate and scale of wages to be paid, that such provisions were included for the benefit and protection of the laborers employed in constructing the building. This construction is further fortified by the fact that the United States Department of Labor was a party to the agreement.... Without the right to bring and maintain the suit on behalf of labor the statute would be ineffectual in its requirement that the public body ascertain the prevailing rate, and that such body in the letting of contracts could ignore such duty at its discretion; this it cannot do.

*Id.* at 536–37.

The SABTC Plaintiffs rely on this case, arguing that it has standing because "labor organizations such as [SABTC] have a legitimate interest in seeing that the workers comprising their constituents, constructions workers, receive the appropriate wages in accordance with the law." We, however, decline to rely on this 1950 Austin Court of Appeals case. It was reversed by the Texas Supreme Court on other grounds, and, in doing so, the supreme court did not address the standing issue, but instead determined that the action of the Highway Commission was not reviewable by the courts. *See Tex. Highway Comm'n v. El Paso Bldg. & Constr. Trades Council*, 149 Tex. 457, 468, 234 S.W.2d 857 (1950), *rev'g* 231 S.W.2d 533 (Tex.Civ.App.-Austin).

Further, since this 1950 Austin Court of Appeals case, the Texas Supreme Court has addressed when an association like SABTC has "associational standing" to bring suit by adopting the United States Supreme Court's standard for associational standing:

The United States Supreme Court has articulated a standard for associational standing that lends itself to our use. We adopt that test today. In *Hunt v. Washington State Apple Advertising Commission*, the Court held that an association has standing to sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

*Tex. Ass'n of Bus.*, 852 S.W.2d at 447.

■ The Texas Supreme Court has also applied associational standing in the context of labor organizations. In *Texas Workers' Compensation Commission v. Garcia*, 893 S.W.2d 504 (Tex.1995), the court considered whether the AFL–CIO had standing to bring an action on behalf of its members challenging the Workers' Compensation Act:

We first address the standing of the Texas AFL–CIO, a voluntary association with 215,000 members organized to promote workers' rights.

An association may sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual

members in the lawsuit." *Texas Ass'n of Business*, 852 S.W.2d at 447 (citing *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)).

*Garcia*, 893 S.W.2d at 518. Thus, the associational standing standard should apply to this case.

■ The City argues that SABTC has neither pled nor proved the first prong of the associational standing test—that its members would otherwise have standing to sue in their own right. The first prong of the test requires that SABTC's "pleadings and the rest of the record demonstrate that [SABTC]'s members have standing to sue in their own behalf." *Tex. Ass'n of Bus.*, 852 S.W.2d at 447. "This requirement should not be interpreted to impose unreasonable obstacles to associational representation." *Id.* Instead, the purpose of this first prong "is simply to weed out plaintiffs who try to bring cases, which could not otherwise be brought, by manufacturing allegations of standing that lack any real foundation." *Id.*

In *Texas Association of Business v. Texas Air Control Board*, 852 S.W.2d at 447, the supreme court was "satisfied" that the Texas Association of Business had not manufactured the lawsuit:

A comparison of the association's membership roster with the list of businesses subjected to state penalties indicates individual TAB members have been assessed administrative penalties pursuant to the challenged enactments. Additionally, TAB has alleged that other of its members remain at substantial risk of penalty. A substantial risk of injury is sufficient under *Hunt. See, e.g., Pennell v. City of San Jose*, 485 U.S. 1, 7 n. 3, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988) (concluding that association of landlords had standing based on pleadings that individual members would likely be harmed

by rent ordinance). Thus, TAB satisfies the first prong of the *Hunt* test.

*Id.*

Similarly, in *Texas Workers' Compensation Commission v. Garcia*, the Texas Supreme Court was satisfied that the AFL–CIO met this first prong:

We agree with the court of appeals that the Texas AFL–CIO meets these requirements.

The purpose of the first element "is simply to weed out plaintiffs who try to bring cases, which could not otherwise be brought, by manufacturing allegations of standing that lack any real foundation." *Tex. Ass'n of Bus.*, 852 S.W.2d at 447 (quoting *New York State Club Ass'n [v. New York]*, 487 U.S. at 9, [108 S.Ct. 2225, 101 L.Ed.2d 1 (1988)]). Evidence at trial indicates that a large majority of Texas AFL–CIO members are covered under the workers' compensation system. Although there was no showing of specific members who have suffered a compensable injury since the effective date of the Act, we may fairly assume the existence of such members based on the size of the union. By doing so, we are not engaging in "unadorned speculation" that the Act will be enforced against AFL–CIO members. *See Pennell*, 485 U.S. at 8[, 108 S.Ct. 849]. We are satisfied that the Texas AFL–CIO represents members who would have standing to sue in their own right.

*Garcia*, 893 S.W.2d at 518–19.

In their petition, the SABTC Plaintiffs pled that SABTC "is a labor council that is composed of and collectively represents affiliated local unions representing building and construction workers in the various crafts and trades of construction work in the San Antonio vicinity." According to the petition, SABTC brings suit "in its own name on behalf of itself and on behalf of the numerous construction workers comprising the membership of its affiliated local unions." In reviewing the record, we are satisfied that the SABTC Plaintiffs represent members who would have standing to sue in their own right and that this is not a manufactured lawsuit. As such, we hold that the SABTC Plaintiffs have standing.

## PREVAILING WAGE RATE

Section 2258.021 of the Texas Government Code, titled "Right to Be Paid Prevailing Wage Rates," requires a worker employed on a public work to be paid the prevailing wage rate:

(a) A worker employed on a public work by or on behalf of the state or a political subdivision of the state shall be paid:

(1) not less than the general prevailing rate of per diem wages for work of a similar character in the locality in which the work is performed; and

(2) not less than the general prevailing rate of per diem wages for legal holiday and overtime work.

(b) Subsection (a) does not apply to maintenance work.

(c) A worker is employed on a public work for the purposes of this section if the worker is employed by a contractor or subcontractor in the execution of a contract for the public work with the state, a political subdivision of the state, or any officer or public body of the state or a political subdivision of the state.

TEX. GOV'T CODE ANN. § 2258.021 (Vernon 2000).

Here, the trial court found that the convention center hotel project is a public work. Thus, pursuant to section 2258.021(a)(1), the SABTC Plaintiffs argue

that the trial court was required to have ruled as a matter of law that the prevailing wage law applied to the project. However, in making this argument, the SABTC Plaintiffs ignore section 2258.002.

Section 2258.002 limits the applicability of chapter 2258 to public works:

**§ 2258.002. Applicability of Chapter to Public Works**

(a) *This chapter applies only to the construction* of a public work, including a building, highway, road, excavation, and repair work or other project development or improvement, *paid for in whole or in part from public funds,* without regard to whether the work is done under public supervision or direction.

(b) This chapter does not apply to work done directly by a public utility company under an order of a public authority.

*Id.* § 2258.002 (emphasis added). Thus, pursuant to section 2258.002, section 2258.021 is not applicable unless the construction of a public work was "paid for in whole or in part from public funds." And, here, the trial court found that the construction of the convention center hotel project was not paid for in whole or in part from public funds. Thus, the trial court did not err in determining that the prevailing wage rate did not apply unless public funds were used for the construction of the project.

PUBLIC FUNDS USED FOR CONSTRUCTION

In their second issue, the SABTC Plaintiffs argue the trial court's finding that the construction of the project was not paid for in whole or in part from public funds is not supported by legally and factually sufficient evidence.

Chapter 2258 does not define "public funds." However, in the context of the Public Funds Investment Act, chapter 2256 of the Government Code, the Texas Attorney General has stated that public funds include "only funds that the state or a political subdivision collects in accordance with a general law and that will be used to benefit the public generally." Op. Tex. Att'y Gen. No. DM–489, at 1 (1998). It defined the term "public funds" as

funds belonging to the state or to any county or political subdivision of the state; more specifically taxes, customs, moneys, etc., raised by the operation of some general law, and appropriated by the government to the discharge of its obligations, or for some public or governmental purpose; and in this sense it applies to the funds of every political division of the state wherein taxes are levied for public purposes. The term does not apply to special funds, which are collected or voluntarily contributed, for the sole benefit of the contributors, and of which the state is merely the custodian.

*Id.* at 2.

*A. Alter–Ego*

■ First, the SABTC Plaintiffs argue that public funds were used because the nonprofit corporation created by the City is an alter ego of the city. In support of their alter ego argument, the SABTC Plaintiffs rely on a 1993 opinion from Pennsylvania: *Lycoming County Nursing Home Association, Inc. v. Commonwealth,* 156 Pa.Cmwlth. 280, 627 A.2d 238 (1993). In *Lycoming,* the county decided to replace and rebuild a nursing home facility, and so it established a private, nonprofit corporation that would build and operate the facility. *Id.* at 240. The corporation entered into a lease/loan agreement with the county, and under the agreement, the county authorized the issuance of two series of General Obligation Bonds and then loaned the proceeds to the corporation.

*Id.* at 240–41. The county, however, remained liable for repayment to bondholders if the corporation defaulted. *Id.* at 241. After an initial inquiry, the Pennsylvania Prevailing Wage Division of the Department of Labor and Industry (PWD) notified the corporation that it must pay prevailing wages for construction under state law. *Id.* The corporation and the county appealed to the Board, which determined that the project was a "public work" requiring payment of prevailing wages. *Id.* The county and corporation appealed. *Id.*

The SABTC Plaintiffs rely on the *Lycoming* court's holding that the nonprofit corporation was an alter-ego of the county:

> The Commissioners, and therefore the County, controlled the project from its inception. The attempts to disassociate the County from the Association did not overcome the fact that the Association was the instrumentality of the County. We clearly do not wish to convey the idea that the Commissioners' acts were fraudulent. However, "the corporate existence can be disregarded without a specific showing of fraud," [Village of] *Camelback [v. Carr]*, 371 Pa. Superior Ct. [452] at 462, 538 A.2d [528] at 533 [(1988)], whenever it is necessary to avoid injustice or when public policy requires. *Id.*
>
> We conclude that the public policy advanced by the Act would be defeated if we allow the County to rely on the independence of the Association. Moreover, by empowering the County to use the Association to build a project, such as the nursing home at issue here, we would condone the circumvention of the Act and its purpose.

*Id.* at 244.

Immediately before this discussion of alter-ego, the *Lycoming* court noted that

under Pennsylvania state law, "public work" was defined as "construction, reconstruction, demolition, alteration and/or repair work other than maintenance work, done under contract and *paid for in whole or in part out of the funds of a public body*. ..." *Id.* at 242 (emphasis added). It then held that public funds were used in the nursing home project because the county remained liable if the corporation defaulted. *Id.* at 243.[4] As such, the prevailing wage act applied to the nursing home project. The court then made an alternative holding:

> Moreover, the Act applies even when a "public body ... proposes the making of a contract for any project of public work." Section 4 of the Act. Therefore, we hold that because the Association used public funds for a public purpose that was proposed by a "public body," it stands in the shoes of the County, is a "public body" doing "public work" and is covered by the Act.

*Id.* (alteration in original). Thus, it logically follows that the *Lycoming* court believed the alter-ego finding to be determinative because the Pennsylvania prevailing wage act applied when a "public body ... proposes the making of a contract for any project of public work."

Here, however, as pointed out by the City, the Texas statute requires two elements: public work and public funds. In its brief, the City explains why the issue of whether the City is an alter ego of the corporation is not applicable to the issue of whether public funds were used:

> Clearly, control over the Hotel Project and any governmental purpose for the Corporation's loan to the Developer are not germane to the Court's determination of whether public funds are used for

---

4. In contrast, here, the City will not be liable if the Developer defaults.

construction of the Hotel Project under the definition of "public funds" urged by both parties. In fact, there are two separate and distinct elements which must be satisfied to invoke the requirements of Chapter 2258 of the Texas Government Code: a) the construction of a "public work," which is b) paid for in whole or in part using "public funds." While use and control of a project may be a consideration in determining whether a project is a public work, this determination is wholly unrelated to the public funds requirement for application of Chapter 2258.

We agree. Whether the nonprofit corporation was an alter-ego of the City is relevant to the issue of whether the project was a public work; it is not relevant to the issue of whether public funds were used in its construction.

### B. Bonds Issued by Nonprofit Corporation

■ Next, the SABTC Plaintiffs argue that the bonds issued by the nonprofit corporation should be considered public funds because the funds loaned to the Developer are to be used for a public purpose. And, they emphasize that the corporation can only expend and loan funds for one purpose: the effectuation of the Project Agreement between the City and the Developer.

The SABTC Plaintiffs rely on *Lower Colorado River Authority v. Chemical Bank & Trust Co.*, 185 S.W.2d 461, 468 (Tex.Civ.App.-Austin), *aff'd*, 144 Tex. 326, 190 S.W.2d 48 (Tex.1945), for the proposition that bond revenues used for a public purpose are public funds. The Austin Court of Appeals, however, did not make this broad holding. Instead, it was asked to determine the validity of a statute requiring water and electrical authorities to make payments identical to but in lieu of ad valorem taxes. *Id.* at 462–63. The

Lower Colorado River Authority ("LCRA") entered into a trust indenture with Chemical Bank & Trust Company of New York and American National Bank of Austin creating a trust primarily intended to secure general obligation bonds sold to the public. *Id.* The trust was funded from LCRA's general operating income. *Id.* at 464. Before the court was the issue of whether a trustee could lawfully pledge a portion of the bank's assets to secure funds used to pay LCRA's operating expenses and costs of acquisitions, and expansions. *Id.* at 467–68. Quoted below is the part of the opinion relied upon by the SABTC Plaintiffs:

> That the Authority is an agency or instrumentality of the State was determined by the Supreme Court in *Lower Colorado River Authority v. McCraw,* 125 Tex. 268, 83 S.W.2d 629 (1935). That the funds deposited by it, to be used only for a public purpose, and subject to expenditure by the Authority only for such purpose, are public funds is not, we think, subject to doubt. The funds of such districts whether raised by taxation or by operation of the "System" are intrinsically so. It is too clear for argument, we think, that such funds did not, as urged by the cotrustee, belong to the bondholders as beneficiaries. They were not set aside, under the Trust Indenture, for the payment of outstanding bonds and interest thereon. The Debt Service Fund and Debt Service Reserve were specifically set aside in the hands of the trustee in New York for that purpose, over which the cotrustee exercised no control. Being public funds the pledge of such securities by the cotrustee to secure the deposit thereof was clearly authorized by both State and Federal laws.

*Id.* at 468 (citations omitted).

In response, the City relies on *Blankenship v. Brazos Higher Education Authori-*

*ty, Inc.,* 975 S.W.2d 353 (Tex.App.-Waco 1998, pet. denied), in support of its argument that the funds generated from the revenue bonds are not "public funds." In *Blankenship,* the issue was whether the Brazos Higher Education Authority, Inc. ("Brazos"), a nonprofit corporation that issues revenue bonds to purchase student loans, was a governmental body subject to the Freedom of Information Act. Brazos argued that it was not a governmental body because it did not receive "public funds." *Id.* at 360. Through an ordinance, the City created Brazos pursuant to section 53.47 of the Education Code, which authorized a city to create nonprofit corporations to issue bonds for the purchase of student loans. *Id.* at 357. Brazos received income from the sale of revenue bonds to private investors, investment earnings, repayments by loan borrowers, interest subsidy payments from the federal government, and claim payments from the Texas Guaranteed Student Loan Corporation. *Id.* at 360. Pursuant to section 53.47, the City approved the issuance of Brazos's revenue bonds. *Id.* However, the funds received from the sale of the bonds came from private investors, and the money used to pay the principal and interest on such bonds came from the private revenue sources. *Id.* No funds of the State of Texas or the City of Waco were used to secure and pay off the bonds when they matured. *Id.* According to the court, "[t]he fact that the City approve[d] the bond issuance does not amount to Brazos spending or being supported by public funds." *Id.*

Similarly, here, the revenue bonds will be sold to private investors and no funds of the State of Texas or the City will be used to secure and pay the bonds. The SABTC Plaintiffs attempt to distinguish *Blankenship* by arguing that the face of the bonds in *Blankenship* stated that they were "special and limited obligations of [Brazos] and

are not general, special, or moral obligations of the State of Texas, the City of Waco, Texas, or any other political subdivision of the state of Texas." *Id.* at 360. The SABTC Plaintiffs, however, ignore the language in the Indenture of Trust between the nonprofit corporation and Wells Fargo Bank, N.A. for the issuance of the revenue bonds for the convention center hotel project. The Indenture of Trust clearly states that neither the City, Bexar County, the State of Texas, or any other political subdivision of the state will ever be liable for the bonds. We, therefore, hold that the issuance of the bonds was not "public funds" as understood in chapter 2258.

## C. Hotel Occupancy Tax

As security for the revenue bonds, the Corporation pledged funds collected by the City from (1) state hotel occupancy tax revenues generated from the convention center hotel project pursuant to chapter 156 of the Texas Tax Code; (2) state sales tax revenues generated from the project pursuant to chapter 151 of the Tax Code; (3) 7% local hotel occupancy tax revenue generated from the project pursuant to chapter 351 of the Tax Code; and (4) 2% available expansion hotel occupancy tax revenue pursuant to sections 351.003 and 351.1065 of the Tax Code. According to the SABTC Plaintiffs, despite the language in the Trust Indenture, the City will be the "ultimate guarantor" of the bonds because the City "is required under the terms of the Project Agreement to deposit state and local hotel occupancy tax revenues and state sales tax revenues in dedicated accounts to meet debt service needs on the bonds should the Hotel operating expenses be insufficient to do so."

In response, the City argues the following:

> [T]he public funds requirement for the applicability of Chapter 2258 is met only

if public funds are used to pay for the actual construction of public work. As such a distinction must be drawn between public funds used to pay for construction and public funds pledged as security for a municipality's debt obligations. *See Wells v. Kentucky Local Correctional Facilities Construction Authority,* 730 S.W.2d 951 (Ky.App. 1987). Clearly, the Corporation's pledged security for the revenue bonds is not funds used for the actual construction of the Hotel Project, and therefore, does not trigger application of Chapter 2258, regardless of whether the pledge is of public funds or not.

As such, we must consider whether bonds secured by the above taxes are public funds that have been used in whole or in part for the *construction* of a public work. *See* Tex. Gov't Code Ann. § 2258.002 (Vernon 2000) (emphasis added) ("This chapter *applies only to the construction* of a public work ... paid for in whole or in part from public funds....").

According to the Code Construction Act, when interpreting a statute, "[w]ords and phrases shall be read in context and construed according to the rules of grammar and common usage." *Id.* § 311.011(a) (Vernon 2005); *see Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson,* 209 S.W.3d 644, 651 (Tex., 2006) ("Ordinarily, the truest manifestation of what legislators intended is what lawmakers enacted, the literal text they voted on."). Additionally, "whenever possible, we construe statutes as written, but where the enacted language is nebulous, we may cautiously consult legislative history to help divine legislative intent." *Alex Sheshunoff,* 209 S.W.3d at 651.

Here, section 2258.002 derives from section 4 of former article 5159a. *See* Act of Mar. 21, 1933, 43d Leg., R.S., ch. 45, § 4, 1933 Tex. Gen. Laws 91, 93 ("Any construction or repair work done under con-

tract, and paid for in whole or in part out of public funds, ... whether or not done under public supervision or direction, or paid for wholly or in part out of public funds, shall be held to be 'public works' within the meaning of this Act."). Former article 5159a, the prevailing wage statute, was first enacted in 1933 as article 5159a of the Revised Civil Statutes. *See id.* It was then repealed and codified as chapter 2259 of the Government Code as part of the nonsubstantive revision of statutes in 1995. *See* Act of Apr. 25, 1995, 74th Leg., R.S., ch. 76, §§ 1.01 (purpose of Act to codify statutes without substantive change), 5.49(a) (codifying article 5159a by adding Government Code chapter 2258), 5.49(b) (repealing article 5159a), 1995 Tex. Gen. Laws 458, 458, 502–05. Because section 2258.002 is a nonsubstantive codification of section 4, we construe it consistently with its statutory predecessor. *See City of La Porte v. Barfield,* 898 S.W.2d 288, 294 (Tex.1995) (construing nonsubstantive codification consistently with statutory predecessor).

Former article 5159a was enacted in 1933 in response to the Great Depression. The Act's "emergency clause" included the following statement:

The fact that there is no adequate law protecting laborers, workmen and mechanics engaged in doing and performing work on public works in Texas and its political subdivisions, and the further fact that many contractors are taking advantage of the present industrial and economic condition to beat down wages to a level far below that required to maintain a laborer, workman or mechanic in reasonable circumstances, and the further fact that this condition has created a social problem demanding the immediate attention of the legislative department of our State, create an

emergency and an imperative public necessity....

Act of Mar. 21, 1933, 43d Leg., R.S., ch. 45, § 7, 1933 Tex. Gen. Laws 91, 93–94. The purpose of section 4 of the Act (now section 2258.002) was not to expand the scope of the prevailing wage requirement but rather to clarify the meaning of "public works." Section 4 established that only public works paid for in whole or in part with public funds were subject to the prevailing wage requirement. *See id.* § 4, at 93; *see also* Op. Tex. Att'y Gen. Nos. JC–0032 (1999), O–2059 (1940). Thus, nothing in the legislative history indicates that the Legislature meant anything other than the plain meaning of the word "construction."

In considering the plain meaning of the phrase "construction of a public work ... paid for in whole or in part from public funds," we construe it to mean public funds actually used to construct the public work—here, the convention center hotel. The taxes at issue, however, are not funds that are being used for the *construction* of the convention center hotel; instead, they are being used as security in the event that the Developer is not able to pay the bond holders. The possibility of the taxes being paid as security does not make them public funds used in the construction of the convention center hotel.[5] As such, the trial court did not err in determining the public funds were not used in the construction of the hotel.

The City has also brought a cross-point challenging the trial court's finding that the convention center hotel project is a "public work." However, because we have determined that public funds were not used in the construction of the hotel, we need not determine whether the hotel was a public work.

5. Having determined that public funds were not used in the construction of the hotel, we

CONCLUSION

Because public funds were not used in the construction of the convention center hotel, we affirm the judgment of the trial court.

Dissenting opinion by CATHERINE STONE, Justice.

For decades the Prevailing Wage Rate statute has embodied the public policy of the State of Texas which places great importance on the payment of fair wages to construction workers who build public works in the state. With the advent of public-private partnerships and ventures, questions arise about just what constitutes a public project and whether public funds are being used to fund construction of a public project. Indeed, sophisticated real estate lawyers are advised that "[c]areful structuring of a transaction may allow an exemption from prevailing wages to be claimed...." Teresa Buchheit Klinkner, *Fair Play*, 26–JAN L.A. Law. 46 (January 2004).

The City of San Antonio's project agreement with Hotel Investments, L.P. to construct and operate the convention center hotel is a prime example of a public-private venture which raises questions about payment of prevailing wage rates. Through artfully crafted project documents, the City seeks to avoid application of the prevailing wage rate statute and thus circumvent this state's long-standing commitment to payment of fair wages to construction workers on publically-funded public projections. Because the majority opinion permits this conduct, I respectfully dissent.

The majority concludes that public funds were not used in the construction of the

need not determine whether the taxes were public funds themselves.

convention center hotel. By holding that the plain meaning of the statutory phrase "construction of a public work ... paid for in whole or in part from public funds" means public funds actually used to construct the public work, the majority draws a very restrictive definition of "public funds."

The majority argues that the taxes at issue are not funds used for the actual construction of the convention center hotel because they will be used only as security in the event the developer is unable to pay the bond holders. The majority thus holds that the taxes paid as security are not public funds used in the construction of the convention hotel center and to include them in the definition of "public funds" would wrongly expand the scope of the prevailing wage rate law. I disagree.

The City Council created the nonprofit convention center hotel finance corporation so that it could issue Series 2005A Tax–Exempt Empowerment Zone Bonds totaling up to $130,000,000.00 and Series 2005B Taxable Revenue Bonds totaling up to $100,000,000.00. The express purpose of the nonprofit corporation is to finance "a portion of the costs required to *construct* ... a privately-owned hotel...." (Emphasis added). Additionally, as security for the revenue bonds, the corporation pledged funds collected by the City from various state and local hotel occupancy tax revenues generated from the project. While the bonds expressly state that they are not a general debt or an obligation of the City, the State of Texas, or any political subdivision of the State, these security interests were at stake and I believe the possibility that they could be used to satisfy the debt is enough to include them in the "public funds" definition. Additionally, the Developer has benefited from tax-exempt bonds during the hotel construction. These examples are arguably similar to

other less common examples of public funds, such as fee waivers, low interest loans, and reduced rent on ground leases. *See* Teresa Buchheit Klinkner, *Fair Play*, 26–JAN L.A. Law. 46, 48 (January 2004).

Because I believe that the term "public funds" should be construed to support the broad purpose of the prevailing wage rate law, the text of section 2259.002 of the Government Code should be read to incorporate within the "public funds" definition construction projects of public works financed through tax breaks and bond statutes that might necessitate the use of public funds. By rejecting the majority's argument and adopting this more expansive reading of "public funds," I believe that the purpose of the law is best served.