Honorable Michael J. Murphy Washington State Treasurer P.O. Box 40200 Olympia, WA 98504-0200
Dear Mr. Murphy:
By letter previously acknowledged, you have requested an opinion on several questions concerning a proposed construction project on land in Olympia called the "Wheeler Block." For [original page 2] clarity, we have slightly paraphrased some of the questions. The questions we address are as follows:
1. Does the maximum occupancy cost per square foot provision ofsubsection (8) of the capital budget authorization for the Wheeler Blockdevelopment apply to all or only to some of the facilities contemplatedin the budget authorization?
 2. In calculating the occupancy cost per square foot, must thecalculation be performed on both a square foot and a per employeebasis?
 3. In adjusting lease rates for "level of service" for comparisonpurposes, are capital facilities or quality of facilities appropriatelytreated as "services" under the budget authorization?
 4. Is there any ultimate cap on either the occupancy cost or the totaldollar cost of the facilities to be financed?
 5. With respect to the OFM certification that is required under thebudget authorization, what are the legal consequences, if any, of an"inaccurate" certification by OFM?
 6. May the state Treasurer reject the OFM certification?
 7. What criteria should the State Finance Committee use to determinewhether it is "reasonably certain" that the proposed financing isexcluded from the computation of indebtedness?
 8. Is the proposed financing lease a "financing contract" underRCW 39.94, and could it create state indebtedness?
 9. Do the characteristics of the proposed transaction render itanalogous to the unsuccessful attempt to avoid state debt in the1955 State Building Financing Authority case?
 10. Does article VIII, section 1(h) of the Washington Constitutionaffect the legality of the Department of Information Services' paymentof rental amounts under the proposed financing lease?
 11. Do public works bidding laws apply to the construction of thefacilities to be leased to the state?
 [original page 3] BRIEF ANSWERS
The maximum occupancy cost provision in the capital budget authorization for the Wheeler Block project facilities applies only to the office buildings component of the project. The maximum occupancy cost is to be measured either on a per square foot basis or a per employee basis; it is not necessary to use both bases. The lease rate adjustment that is to be performed based on "level of service" should take into account any differences in essential systems, as well as differences in general services such as elevators, landscaping, and parking lot maintenance that are typically provided to office tenants. The occupancy cost for the office buildings component of the facilities is limited to an amount not to exceed 110 percent of comparable private market rental rates measured on a per-square foot or per-employee basis. The total cost of the facilities to be financed will effectively be limited by a guaranteed maximum price development agreement. The budget language assumes OFM will perform its functions under the capital budget authorization competently and in good faith, and it prescribes no specific consequences for an "inaccurate" certification. The state Treasurer does not have authority to reject OFM's certification. A properly drafted financing contract that complies with RCW 39.94 and which is accompanied by (1) a properly drafted Finance Committee resolution and (2) properly drafted transaction and offering documents will not create state indebtedness. This conclusion remains true where the financing contract is executed as a part of a properly authorized 63-20 financing. Facilities that are constructed under properly authorized and structured 63-20 financings do not constitute a "public work" under RCW 39.04.
 FACTUAL BACKGROUND
In response to a need by the state for additional office space and other facilities on the East Capitol Campus in Olympia, in 2007, the Legislature authorized the Department of Information Services ("DIS") to lease develop or lease purchase a new office building and certain other facilities on the "Wheeler Block" in Olympia.[1] [2]Rather than authorize the issuance of bonds to finance a project to be developed by the state, the Legislature authorized DIS to enter into a financing contract for a project to be privately developed.
Because the language of Laws of 2008, ch. 328, § 6001 (the "Capital Budget"), the most recent budget authorization for the DIS project, is central to our responses to several of your questions, we have attached it in full as Attachment A.
 [original page 4] ANALYSIS 1. Does the maximum occupancy cost per square foot provision ofsubsection (8) of the capital budget authorization for the Wheeler Blockdevelopment apply to all or only to some of the facilities contemplatedin the budget authorization?
The Capital Budget distinguishes between the component parts of the Wheeler Block project. As noted in Attachment A, the Capital Budget provided that DIS is authorized
to lease develop or lease purchase a state general officebuilding and facilities for the department of information services on the state-owned property called "the Wheeler block" in Olympia. Theoffice buildings shall be constructed and financed so that agencies[`] occupancy costs per gross square foot or per employee will not exceed 110 percent of comparable private market rental rates per gross square foot or per employee. The comparable general office space rate shall be calculated based on recent Thurston county leases of new space of at least 100,000 rentable square feet adjusted for known escalation clauses, expected inflation, and differences in the level of service provided by the comparable leases as determined by the department in consultation with the department of general administration.
Laws 2008, ch. 328, § 6001(8) (emphasis added). Although the Legislature refers alternatively to "office buildings" and "facilities" in various parts of subsection (8), in the context of imposing the private market rental rate "ceiling," the Legislature is clear in its use of the phrases "office buildings" and comparable "general office space" rate.
The discrete components of the DIS project are explained in more detail in the pre-design report that DIS commissioned to assist it in analyzing its options for addressing its need for additional space. The "architectural narrative" in this report summarizes the DIS project as follows:[3]
The program [described] above has been distributed into the facility in the following building components. . . .
Office Building
The office building component is five stories and 115,000 square-feet, located on the north part of the site along 14th Avenue. . . . It will contain the majority of the DIS groups along with the larger shared spaces for the facility such as cafeteria, boardroom, and large conference space. . . .
[original page 5] Data Center Offices/Studio/Production
This portion of the project provides the "link" between the office component and the data halls. It is three stories with a basement level. The first floor contains the production facility, Studio, and loading dock. The upper floors contain office space related specifically to the data hall operations. A warehouse is located in the basement connected to the first floor and loading dock with a heavy-duty freight elevator.
Data Halls/Infrastructure
The third component of the facility contains the main raised floor computing facility for the DIS and the infrastructure/mechanical spaces to support the equipment contained within. Four 15,000 [square foot] data halls are provided, three on the first floor and one located in the basement level with the remaining floor area in the basement containing the UPS system, batteries, chillers, and switch gear. Cooling towers and emergency generators are located on the first floor on the east side of the building next to the loading dock and existing electrical sub-station.
Washington State Department of Information Services Data Center andOffice Building Pre-design Report, at 32 (Apr. 18, 2007) (Perkins+Will Report). See also RFP, at 5 (describing "principal components" of DIS project as "Office Building #1 for DIS," "Data Center Complex" ["Link building" and "data halls"], and "Office Building #2 for Washington State Patrol Small Agency Offices"); 2007-09 Capital Budget New Appropriations Project List, at 611 (describing Wheeler Block project financing via lease-purchase agreement "with lease costs for office space within the range of the private market") (emphasis added).
Thus, on the basis of the Legislature's own words, also reflected in the more detailed explanations of the DIS project contained in the pre-design report and the RFP, we conclude that the occupancy cost limitation applies only to the office buildings portion of the project. This result is consistent with the Legislature's prior application of an occupancy cost limitation to the Tumwater Office Building. See Laws of2001, 2d Sp. Sess., ch. 8, § 907(2)(c) (providing that occupancy costs for a "state office building" will not exceed "comparable private market rental rates . . . calculated based on the three latest Thurston county leases of new space of at least 100,000 rentable square feet").[4]See also City of Olympia v. Drebick, 156 Wn.2d 289, 295, 126[original page 6] P.3d 802, cert. denied 127 S. Ct. 436,166 L. Ed. 2d 330
(2006) (statutory provision's plain meaning may be ascertained by examination of statute in which provision at issue is found, as well as related statutes or other provisions of same act in which provision is found).
2. In calculating the occupancy cost per square foot, must thecalculation be performed on both a square foot and a per employeebasis?
The Capital Budget provides that the "office buildings shall be constructed and financed so that agencies[`] occupancy costs per gross square foot or per employee will not exceed 110 percent of comparable private market rental rates per gross square foot or per employee." Laws of 2008, ch. 328, § 6001(8) (emphasis added). "Ordinarily, the word `or' does not mean `and' unless there is clear legislative intent to the contrary." HJS Dev., Inc. v. Pierce Cy., 148 Wn.2d 451, 473 n. 94,61 P.3d 1141, 1152 (2003).
From the context in which it was used, we think the Legislature meant "or" in its ordinary, disjunctive sense. The use of "or" in the authorizing language certainly can be read to mean that the Legislature was deferring to DIS to determine, in consultation with the Department of General Administration ("GA"), which of the two designated cost parameters would be more suitable under the circumstances. Given GA's institutional knowledge of leasing matters, this appears to us to be the most logical reading of the subject language.[5]
Moreover, we note that the non-DIS office building was to be designed as a demonstration project, which would "provide for staffing and space efficiencies resulting from central reception, support services, and spaces." Laws of 2007, ch. 520, § 6013(8). The Legislature could logically have concluded that, as a result of such characteristics, the building's occupancy cost savings may reasonably be reflected in a per employee measure of cost. In contrast, a per square foot measure might be more appropriate for a more traditional office building such as the DIS building.[6] Requiring that both measurements be applied to both office facilities, despite their inherent differences, would not necessarily provide the kind of meaningful cost comparisons that the Legislature presumably desired. Cf. In re Personal Restraint ofAndress, 147 Wn.2d 602, 610, 56 P.3d 981 (2003) (statutes should be construed to effect their purpose, and strained, unlikely, or absurd consequences resulting from literal reading are to be avoided).
[original page 7] To summarize, we conclude that in calculating the occupancy cost maximum for each of the office buildings, DIS is to useeither a cost per square foot or a cost per employee but need not use both for a given building.
3. In adjusting lease rates for "level of service" for comparisonpurposes, are capital facilities or quality of facilities appropriatelytreated as "services" under the budget authorization?
For ease of reference, we repeat here the relevant language from the Capital Budget:
The office buildings shall be constructed and financed so that agencies[`] occupancy costs per gross square foot or per employee will not exceed 110 percent of comparable private market rental rates per gross square foot or per employee. The comparable general office space rate shall be calculated based on recent Thurston county leases of new space of at least 100,000 rentable[7] square feet adjusted for known escalation clauses, expected inflation, and differences in the level ofservice provided by the comparable leases as determined by the department in consultation with the department of general administration.
Laws of 2008, ch. 328, § 6001 (emphasis added).
Because "services" is not defined in the Capital Budget, we refer to dictionary definitions to determine the common meaning of the term.See Quadrant Corp. v. State Growth Mgmt. Hrgs. Bd., 154 Wn.2d 224, 239,110 P.3d 1132 (2005) (where the Legislature has not specifically defined statutory term, the court applies common meaning, which may be determined by referring to dictionary). "Services" means "useful labor that does not produce a tangible commodity; a facility supplying some public demand, such as telephone or bus service; a facility providing maintenance and repair, such as television service." Merriam-Webster OnLine Dictionary (found at www.merriam-webster.com).
In the context of commercial leases, "services" are reasonably understood to refer to such things as the provision and maintenance of essential systems such as electrical, plumbing, heating, ventilating, and air-conditioning, as well as the provision of general services typically provided to office tenants, such as elevators, landscaping, and parking lot maintenance. See, e.g., Department of Administration,Standard Lease Sample(effective 10/22/2007 v1.1.1) (found at www.ga.wa.gov/RES/form.htm). Thus, we read "differences in level of service" in the Capital Budget to refer to differences in the level of these kinds of systems and general services.
If the Legislature intends a broader meaning with respect to the desired operative effect of comparing the occupancy costs for the new office buildings and private office space based on [originalpage 8] a "difference in the level of services," it is of course free to amend the Capital Budget language to differently define the term.[8]
 4. Is there any ultimate cap on either the occupancy cost or the totaldollar cost of the facilities to be financed?
As was the case in the Tumwater Office Building capital budget authorization (See Laws of 2001, 2d Sp. Sess., ch. 8, § 172; Laws of 2003, ch. 10, § 903), the Legislature has not specified a specific dollar amount for the Wheeler Block project financing contract. Instead, the Legislature has authorized a financing contract "for an amount approved by the office of financial management for costs, financing expenses and required reserves."[9] Laws of 2008, ch. 328, § 6001(8). As discussed above, the occupancy cost for the project's office buildings may not exceed 110 percent of comparable private market rental rates. Thus, the 110 percent limit does effectively limit the occupancy cost for the office buildings part of the project.
With respect to the non-office building part of the project, the Legislature did not impose a specific dollar or conceptual cost limit. Presumably, this is because there are no comparable data centers from which one can derive a "comparable private market rental rate" or experience-based cost estimate.[10] However, as a practical matter, there is an upper limit to the overall project cost. The RFP calls for the successful proposer to enter into a guaranteed maximum price (GMP) development agreement for the project. See RFP, at 15 (ultimate construction costs to be incorporated in development GMP), 20 (successful proposer will collaborate with DIS and other state officials resulting in guaranteed maximum price development agreement). This agreement would establish an upper limit on the overall project cost. Furthermore, the fiscal resources of DIS's state agency clients and other clients who would be paying rents to DIS are finite and thus represent a practical limit on the dollar magnitude of any GMP development agreement.[11] [original page 9]
 5. With respect to the OFM certification that is required under thebudget authorization, what are the legal consequences, if any, of an"inaccurate" certification by OFM?
 6. May the state Treasurer reject the OFM certification?
Your questions 5 and 6 are related, so we discuss them together. In the Capital Budget, OFM is required to certify to certain facts:[12]
 • The project description.
 • The project dollar amount.
 • Occupancy costs per square foot will not exceed 110 percent of comparable private market rental rates per gross square foot or per employee.
 • State agency tenants in the general state agency office building will include the state patrol, and the building will include facilities for small agencies and offices.
 • DIS designs and operates the general office building as a demonstration of the efficiencies gained from the integration of office space and telecommunications and computer technology.
 • The demonstration project will provide office space, furniture, telecommunications, and computer technology as a single package.
 • The general office building will be designed so that small agencies and offices can move in and out of the facility without the typical moving expenses that result from individual agency ownership of furniture and technology.
 • The general office building will provide for staffing and space efficiencies resulting from central reception, support services, and spaces.
See Laws of 2008, ch. 328, § 6001(8).
The Legislature's reliance on OFM for an assurance regarding the attainment of certain factual, programmatic objectives is consistent with OFM's increasingly central role in the analysis of state capital project proposals. In the same legislative session in which the Legislature authorized the Wheeler Block project, the Legislature also elevated OFM's role in state facility planning and management. Thus, in Laws of 2007, ch. 506, the Legislature found that, "State facility analysis and portfolio management can be strengthened through greater oversight and support from the office of financial management and the legislature and with input [original page 10] from stakeholders."Id. at § 1. The legislation requires that OFM "prepare an implementation plan to improve the oversight of real estate procurement and management practices." Id. at § 2.
The legislation also provides that, "State agencies shall not enter into new or renewed leases of more than one million dollars per year unless such leases have been approved by the office of financial management". Id. at § 4(4). Further, among other provisions, "State agencies are prohibited from entering into lease agreements for privately owned buildings that are in the planning stage of development or under construction unless there is prior written approval by the director of the office of financial management." Id. at § 5.
In short, the Legislature has integrated OFM into fundamental state leasing decisions. The Legislature has not conferred on the State Finance Committee or the state Treasurer new legal authority to review OFM certifications or otherwise to interpose objections to such certifications via the process of reviewing financing contracts.[13]
Both the context of the Capital Budget language and OFM's now central role in state facility planning decisions cause us to conclude that the Legislature intended OFM, and only OFM, to make the certification set forth in the Capital Budget. Thus, neither the state Treasurer nor any other state agency is given authority to reject OFM's certification or dispute its accuracy.
For similar reasons, we conclude that the Legislature did not specify legal consequences to attach to an assertedly "inaccurate" certification by OFM. As discussed, the Legislature intends that OFM bring its expertise and resources to bear on state leasing decisions so that the state receives the best value possible in facility acquisitions. The statute assumes that OFM will properly perform the role assigned to it and will exercise good judgment in making the certifications described above. In establishing this as a programmatic objective, the Legislature has not evinced any intent to alter existing legal relationships or to establish a procedure for challenging OFM's findings.
Thus, we do not believe that perceived inaccuracies in OFM certifications either give rise to legal claims or otherwise call into question the validity of financing contracts that are approved by the State Finance Committee.[14] The "check" on OFM's authority in this regard [original page 11] appears to be the Legislature's continuing authority to define (or reconsider) OFM's role and the Legislature's continuing confidence in OFM's performance of its role.
7. What criteria should the State Finance Committee use to determinewhether it is "reasonably certain" that the proposed financing isexcluded from the computation of indebtedness?
 8. Is the proposed financing lease a "financing contract" underRCW 39.94, and could it create state indebtedness?
 9. Do the characteristics of the proposed transaction render itanalogous to the unsuccessful attempt to avoid state debt in the 1955State Building Financing Authority case?
We answer questions 7, 8 and 9 together, because they require essentially the same analysis. As you know, in Department of Ecology v.State Finance Committee, 116 Wn.2d 246, 804 P.2d 1241 (1991), the state Supreme Court held that a financing contract that was authorized under RCW 39.94 and which contained a non-appropriation clause did not create debt within the meaning of article VIII, section 1 of the state constitution. This case has not been overruled or modified, and we have seen nothing in subsequent Washington cases that causes us to think that the central analysis of that case should not continue to govern questions regarding financing contracts under RCW 39.94.[15]
A "financing contract" is defined to mean:
 "Financing contract" means any contract entered into by the state for itself or on behalf of an other agency which provides for the use and purchase of real or personal property by the state and provides for payment by the state over a term of more than one year, and which provides that title to the subject property may [original page 12] secure performance of the state or transfer to the state or an other agency by the end of the term, upon exercise of an option, for a nominal amount or for a price determined without reference to fair market value. Financing contracts shall include, but not be limited to, conditional sales contracts, financing leases, lease purchase contracts, or refinancing contracts, but shall not include operating or true leases. For purposes of this chapter, the term "financing contract" shall not include any nonrecourse financing contract or other obligation payable only from money or other property received from private sources and not payable from any public money or property. The term "financing contract" shall include a "master financing contract."
RCW 39.94.020(2).
The Legislature previously authorized GA to enter into a financing contract that did not provide for the use of certificates of participation. See Laws of 2003, ch. 10, § 903. This authorization, for the Tumwater Office Building, used language that is strikingly similar in certain respects to that which the Legislature used for the Wheeler Block project:
 The department shall finance this project using a financing contract as authorized in section 907(2)(c), chapter 8, Laws of 2001 2nd sp. sess., [16] with title passing to the state if all payments are made as provided in the contract. Should the [original page 13]
department choose to use a financing contract that does not provide for the issuance of certificates of participation, the financing contract shall be subject to approval by the state finance committee as required by RCW 39.94.010. In approving a financing contract not providing for the use of certificates of participation, the state finance committee should be reasonably certain that the contract is excluded from the computation of indebtedness, particularly that the contract is not backed by the full faith and credit of the state and the legislature is expressly not obligated to appropriate funds to make payments. For purposes of this section, "financing contract" includes but is not limited to a certificate of participation and tax exempt financing similar to that authorized in RCW 47.79.140.
Laws of 2003, ch. 10, § 903(2).
In the case of the Wheeler Block project, the Legislature has expressly authorized the financing of the project as a financing contract under RCW 39.94. The Capital Budget provides, in relevant part, that DIS is authorized to
 [e]nter into a financing contract for an amount approved by the office of financial management for costs and financing expenses and required reserves pursuant to chapter 39.94 RCW. . . . Should the department of information services choose to use a financing contract that does not provide for the issuance of certificates of participation, the financing contract shall be subject to approval by the state finance committee as required by RCW 39.94.010. In approving a financing contract not providing for the use of certificates of participation, the state finance committee should be reasonably certain that the contract is excluded from the computation of indebtedness, particularly that the contract is not backed by the full faith and credit of the state and is expressly not obligated to appropriate funds to make payments. For purposes of this section, "financing contract" includes but is not limited to a certificate of participation and tax exempt financing similar to that authorized in RCW 47.79.140.
Laws of 2008, ch. 328, § 6001 (8) (emphasis added).
On the basis of this language and the nearly identical language by which the Legislature authorized GA to enter into a financing contract for the Tumwater Office Building 63-20 financing, there can be no question that the Legislature considers a 63-20 project to be an appropriate subject of a financing contract.[17] The Washington State Treasurer's Report on 63-20 Capital Projects Financing stated:
[original page 14] 63-20 financings were first approved by the Internal Revenue Service in 1963. Such financings have been used in other states for parking garages, correctional facilities, hospitals, schools, and some transportation projects. Under the 63-20 structure, 63-20 bonds are issued by a nonprofit corporation on behalf of the public agency pursuant to a trust indenture with a bank trustee. This issuance by the nonprofit differentiates the 63-20 financing from COPs, where the public entity is the issuer. The 63-20 bond proceeds are deposited in a project fund held by the trustee and used to finance the capital improvements (undertaken by the nonprofit corporation) that are leased to the public agency.
The nonprofit corporation, often through a private development company, designs and builds the project. The project may be operated and maintained either by the public agency itself under the lease from the nonprofit corporation or by the nonprofit corporation through a management contract with a private management firm. Title to the project typically is held by the nonprofit during the life of the bonds. Title to the improvements is transferred to the public agency at lease maturity when the bonds issued by the nonprofit corporation are retired.
State of Washington Office of the State Treasurer, Report on 63-20Capital Projects Financing, at 12-13 (Jan. 23, 2006) (63-20 Report). In other words, certificates of participation are not the exclusive method of financing property being acquired by the state under a financing contract.
It is equally clear that the Legislature did not intend the financing contracts for the Wheeler Block project or the Tumwater Office Building project to create state debt. In this regard, we note that the authorizing language for the two projects was identical:
 In approving a financing contract not providing for the use of certificates of participation, the state finance committee should be reasonably certain that the contract is excluded from the computation of indebtedness, particularly that the contract is not backed by the full faith and credit of the state and the legislature is expressly not obligated to appropriate funds to make payments. For purposes of this section, "financing contract" includes but is not limited to a certificate of participation and tax exempt financing similar to that authorized in RCW 47.79.140.
Laws of 2008, ch. 328, § 6001; Laws 2003, ch. 10, § 903(2) (emphasis added). In crafting this language, the Legislature was relying upon the state Supreme Court's decision in the Ecology case. In that case, the Court examined state legislation (RCW 39.94) which authorized a financing contract for financing the construction of a new headquarters building for the Department of Ecology. In rejecting the State Finance Committee's assertion that a financing contract creates debt within the meaning of article VIII, section 1 of the state constitution, the Court held that where a financing contract complies with RCW 39.94 and contains a non-appropriation clause, it does not create state indebtedness. See Ecology v. State, 116 Wn.2d at 256.
[original page 15] The Legislature's own authorizing language for the Wheeler Block and Tumwater Office Building projects provides a guide for the state Finance Committee to achieve "reasonable certainty" regarding the legal effects of the financing contract. The financing contract, Finance Committee authorizing resolution, bond documents, and offering documents should make clear that (1) the state's only financial obligation is to make lease payments if funds are appropriated for that purpose and that the Legislature's decision not to appropriate such funds does not constitute a default by the state, and (2) the bonds are not general obligations of the state and are not backed by the full faith and credit of the state. Given the settled nature of the relevant law in Washington and the state's prior experience with both the Department of Ecology building and Tumwater Office Building financings, there should be no obstacle to the proper drafting of such documents. At the risk of stating the obvious, we recommend that the state continue to timely engage experienced bond counsel for consultation and assistance with respect to the drafting of such documents and to the structuring of the underlying financings.
10. Does article VIII, section 1(h) of the Washington Constitutionaffect the legality of DIS's payment of rental amounts under theproposed financing lease?
As our response to questions 7, 8 and 9 indicates, we do not believe that a properly drafted financing lease authorized by and in compliance with RCW 39.94, and which is accompanied by other properly drafted transaction documents, creates debt. Thus, in that sense article VIII, section 1(h) of the state constitution need not raise legal issues with respect to the Wheeler Block project financing.
Inherent in this conclusion is the proposition that a properly structured and authorized 63-20 financing need not create a "state" obligation within the meaning of article VIII, section 1.[18] In theEcology case, the State Finance Committee had argued that the Department of Ecology's financing plan was "similar to the one [the state Supreme Court] disallowed in State ex rel. State Bldg. Fin. Auth. v. Yelle".Ecology v. State, 116 Wn.2d at 255. In rejecting this argument, the Supreme Court noted that "the authority was a State agency. . . . Thus, any obligation of the authority to pay the bond holders was, in reality, an obligation of the State. Under the DOE plan the trustee isnot a State agency. Therefore, any obligation the trustee may have to pay the COP holders is not an obligation of the State." Id. at 256.
Similar to the trustee/lessor in the transaction that was the subject of the Ecology decision, the proposed issuer of bonds for the Wheeler Block project is a private, non-profit [original page 16] corporation, not a state agency. Cf. Op. Att'y Gen. 005 (Wyo. 1998), at 10 (concluding that Wyoming Building Corporation is not "alter ego" of state given that (1) corporation is private, non-profit corporation formed under nonprofit corporation law rather than statutorily created state agency; (2) corporation's board, although initially approved by State Building Commission, is self-perpetuating, will not consist of State Building Commission members, and will not otherwise mirror state's governmental body; and (3) corporation's obligations — to repay bonds continues until bonds are paid off — are disparate from obligations of state's obligations, which are merely to pay rent as long as Legislature appropriates money for that purpose).
To reiterate, properly authorized and structured 63-20 financings do not create state obligations within the meaning of article VIII, section 1(h) of the state constitution.
11. Do public works bidding laws apply to the construction of thefacilities to be leased to the state?
State law defines a "public work" to mean
 all work, construction, alteration, repair, or improvement other than ordinary maintenance, executed at the cost of the state or of any municipality, or which is by law a lien or charge on any property therein. All public works, including maintenance when performed by contract shall comply with chapter 39.12 RCW. "Public work" does not include work, construction, alteration, repair, or improvement performed under contracts entered into under RCW 36.102.060(4) or under development agreements entered into under RCW 36.102.060(7) or leases entered into under RCW 36.102.060(8).
RCW 39.04.010(4). Thus, for purposes of determining whether a project is a "public work," there are two factors to consider: (1) whether the project is executed at the cost of the public entity; or (2) whether the project is subject to lien. Supporters of the Center, Inc. v.Moore, 119 Wn. App. 352, 357, 80 P.3d 618 (2003). However, for most projects involving a public entity, there is in essence only one factor — whether the project is executed at the cost of the public entity, since publicly-owned property is not subject to lien:
It seems plain that [the retainage laws in chapter 60.28 RCW] were enacted and have remained the law in recognition of the law that public property has never been subject to mechanics' or materialmen's liens under our general mechanics' and materialmen's lien statutes. . . . The almost universally accepted rule is that general mechanics' and materialmen's lien statutes, in the absence of express words therein subjecting public property to such liens, do not subject public property to such liens.
[original page 17] Hall Olswang v. Aetna Cas. Sur. Co.,161 Wash. 38, 47, 296 P. 162 (1931) (citations omitted).[19]
We have previously alluded to the question of whether a lease-financed facility constitutes a "public work" without having squarely addressed the specific issue before us now. In AGO 1996 No. 18, we noted that
 a potential issue exists as to whether construction of a state building financed by means of a financing contract pursuant to RCW 39.94 constitutes a public work because of the structure of such lease-purchase financing. . . . Because the building is not built at the direct cost of the state, it can be argued that the construction is outside the definition of public works. Given the manner in which we respond to the question presented, it is unnecessary to reach this issue in this opinion.
Id. at 5-6 n. 6.
In AGO 1988 No. 17, we considered whether certain "public projects" to be constructed under "lease/lease-back arrangements" constituted a "public work." For purposes of the analysis, we assumed that such a project "would occur when a public hospital district leases real property belonging to the district to a private party under an arrangement whereby the private party will construct a building on the land and lease it back to the hospital district to be used for district purposes." Id. at 2. Given the requester's characterization of the resulting projects as "public projects," and given the lack of specific facts, we concluded that public works laws would apply to the construction of such projects. In doing so, we noted that under the assumed facts, the distinction between outright ownership of a building on the one hand, and a hospital district's lessee status on the other, was not dispositive of the issue of whether the project was a public work. Indeed, we stated that "it would be contrary to the policy of chapter 39.12 if a state agency or municipal corporation could escape the prevailing wage requirements by so easy a device as a lease/lease-back arrangement." Id. at 3.
However, our opinion was "qualified" as to the question whether "public work" encompassed other projects involving somewhat different fact patterns. We noted that "another common arrangement is for a public entity to lease out property, with the lessee to build a structure or other improvements, the improvements to revert to the lessor's ownership at the end of the lease term." Id. With respect to such projects, we said:
 In the case of long-term leases where the useful life of the improvements will be substantially expended before they revert to the lessor, it seems unlikely that the construction of the improvements could be deemed a "public work." In the case of relatively short-term leases, especially where the improvements are constructed for the lessor's use and benefit or to the lessor's specifications as related to eventual [original page 18] public use of the property, a different analysis might apply. In these "mixed" factual situations, we must leave our answer somewhat qualified.
Id.
In AGO 1983 No. 2, we considered the question whether construction of low income housing facilities constituted a "public work." In that case, we concluded that even where a given project is paid for entirely with federal funds, the fact that the contractor would have a lien against the property developed by the housing authority "by itself, would cause the project to constitute a `public work' as above defined — regardless of its principal source of funding." Id. at 4.
We are not aware of cases from this state, or other states, that squarely address the issue of whether a project financed pursuant to a financing contract is a "public work." However, a few cases involving somewhat similar issues do shed some light on the issue. In Drake v.Molvik Olsen Electric, Inc., 107 Wn.2d 26, 726 P.2d 1238 (1986), the state Supreme Court considered whether a construction project undertaken by a housing authority and financed entirely by the federal government was a "public work." Citing AGO 1983 No. 2, the Court held that the "source of funding does not determine the applicability of the prevailing wage statute" and that a federally funded construction project undertaken by a housing authority is a "public work" requiring the payment of prevailing wages.[20] Molvik, 107 Wn.2d at 29.
In Spokane v. Department of Labor and Industries, 100 Wn. App. 805,998 P.2d 913 (2000), the Court of Appeals considered whether certain work performed on a city-owned waste-to-energy facility constituted a "public work." Under an "Operation and Maintenance Agreement" with a private company, the city paid the company a flat fee per ton of solid waste processed at the facility. The agreement required the company, among other things, to perform an annual maintenance shutdown. The contract provided that the company was to perform this maintenance "at its sole cost and expense." However, the contract also provided that "the fees ordinarily paid by the City to [company] . . . pay for [the annual maintenance] expenses". Id. at 809.
Quoting, in part, Drake, the Court of Appeals observed, "`The source of funding does not determine the applicability of the prevailing wage statute,' so long as it is publicly funded." Spokane,100 Wn. App. at 813 (quotingDrake, supra, 107 Wn.2d at 29). The court characterized the contract payment structure as creating "a direct, tangible relationship between the fees the City pays and `the operation and/or maintenance of the [facility],' including the [annual maintenance] work."Spokane, 100 Wn. App. at 813. The fact that the company [originalpage 19] determined "the extent and necessary expenditures required to perform the annual maintenance does not alter the public origin of the monies it uses." Id. at 813-14.
In concluding, the Court of Appeals held that a "public work" does not mandate the government's "direct involvement" in the work being performed.[21] "Rather, it requires only that the work be `executed at the cost of' the City. That requirement is met here. In essence, the City finances the work at the [facility]; how efficiently [the contractor] operates the facility determines its profit margin."Id. at 814-15.
In San Antonio Building Construction Trades Council v. SanAntonio, 224 S.W.3d 738 (Tex. 2007), one issue under consideration was whether a hotel and convention center constructed by a private developer and financed in part by conduit revenue bonds was subject to a prevailing wage statute that applied only to "the construction of a public work . . . paid for in whole or in part from public funds".[22]
The city created a non-profit corporation which issued revenue bonds to augment the developer's own funds. The city leased to the developer the property on which the project was to be constructed. Title to the project remained with the developer until the expiration of the lease (seventy-five years plus one optional fifteen-year renewal period), at which time title vested in the city without any requirement for payment by the city. The bonds provided that they were not general obligations of the city or the state of Texas. However, the city's project agreement with the developer required the city to deposit certain tax revenues into debt service accounts if the project's operating revenues were insufficient to meet debt service requirements. Under the financing scheme, the city would not be liable if the developer defaulted.
The union plaintiff argued that the corporation's pledge of designated tax revenues received from the city effectively rendered the project "paid for in whole or in part from public funds." The Court of Appeals disagreed, holding that:
 In considering the plain meaning of the phrase `construction of a public work . . . paid for in whole or in part from public funds,' we construe it to mean public funds actually used to construct the public work — here, the convention center hotel. The taxes at issue, however, are not funds that are being used for the [original page 20] construction of the convention center hotel; instead, they are being used as security in the event that the Developer is not able to pay the bond holders."
Id. at 751.[23]
In analyzing the Wheeler Block project, we conclude that projects constructed pursuant to properly structured and authorized financing contracts under 63-20 financings do not constitute "public works."[24]
In such projects, the developer procures the construction financing and bears the financial and completion risk.[25] See 63-20 Report, at 35 (Noting that under 63-20 financing, obligation may be structured as non-recourse, result being that sole source of repayment may be project revenue and thus bondholders, rather than state, bear risk of nonpayment), 50-51 (spreadsheet comparisons of lease payment components and various financing methods indicate that in 63-20 financings, the developer bears risk, controls the financing, and owns the project until bonds are paid off).[26] While DIS will make lease [originalpage 21] payments, those payments are not the source of funds for construction of the project buildings and facilities. Thus, no public funds are used for the construction and, hence, the project is not a public work. Moreover, although the flexibility that 63-20 financings is said to provide to agencies and local governments is attributed in part to the ability to proceed without application of all competitive bid requirements (see 63-20 Report, at 32), the 63-20 financing method has numerous other stated benefits: timing flexibility, expedited completion compared to conventional project delivery methods, lower project costs, substitution of private resources and personnel for constrained public resources, risk shifting to the private sector, and access to new sources of private capital. See 63-20 Report, at 31-35. Moreover, the 63-20 financing method is a federally and state recognized, tax-exempt financing mechanism. It cannot be said that the 63-20 financing mechanism has no intrinsic value or purpose other than to permit agencies to "escape" the effect of public works laws.[27]
Thus, for the reasons discussed above, we conclude the Wheeler Block project is not a "public work." I hope the foregoing information will prove useful.
Sincerely,
 ROB McKENNA Attorney General
 ROBERT J. FALLIS Assistant Attorney General
:pmd
[1] See Request for Proposal #A08-RFP-020 for The Wheeler SiteDevelopment on the East Capitol Campus in Olympia, Washington by the Washington State Department of Information Services (released on October 8, 2007) ("RFP") (providing in part that, "The State of Washington has determined a need for additional state office buildings and facilities on the east Capitol Campus in Olympia for the Department of Information Services (DIS), Washington State Patrol (WSP) and other agencies.") Id., at 1.
[2] See Master Plan for the Capitol of the State of Washington (June 2006), at OS-9 (accessible athttp://www.ga.wa.gov/MasterPlan/Campus-Master-Plan.pdf).
[3] The additional office building for the other state agencies was subsequently added to the overall project.
[4] We also believe this result is the only practical one given the widely different characteristics of the various components of the DIS project. The cost per square foot of constructing the highly specialized data halls was estimated to exceed the cost of constructing the DIS office building by 57 percent. See Perkins+Will Report, at 98 (estimate of construction cost per square foot for Data Center is $481.93, and for Office Building, $306.63). Imposing a cost limitation based on the market for office space on a building component that is fundamentally different from — and inherently more expensive than — an office building would either preclude its construction altogether by preventing the payment of a lease rate sufficient to cover the building's cost, or effectively causing the construction of something profoundly different from what the Legislature desired to have built. We cannot assume that the Legislature would have intended either result. See In re PersonalRestraint of Andress, 147 Wn.2d 602, 610, 56 P.3d 981, as corrected
(Oct. 29, 2002), as amended on denial of reconsideration (Mar. 14, 2003) (statutes should be read to effect their purpose, and strained, unlikely, or absurd consequences resulting from literal reading are to be avoided).
[5] See RCW 43.82.010 (providing that GA, after consultation with OFM, "shall purchase, lease, lease purchase, rent, or otherwise acquire all real estate . . . as may be required by elected state officials, institutions, departments, commissions, boards, and other state agencies").
[6] The selection of the most appropriate cost measure may also be influenced by the extent to which an agency can, or cannot, easily identify space needs on a per employee basis. See State of Washington Department of General Administration Space Allocation Standards (October 2000), at 3 (explaining that small to medium size agencies generally use a fixed square foot "space allocation standard" for determining agency space needs while larger and/or more specialized agencies use a "functional programming standard allowance").
[7] "Tenant's rentable square feet" refers to the measurement on which a tenant's rent is usually based. It is computed by adding a percentage ("core factor") of common areas to the tenant's usable square feet.www.businessdictionary.com(last visited Oct. 13, 2008).
[8] In this respect, we are aware that some may read "differences in level of services" more broadly than we are able to. However, absent legislative expression of a broader meaning, we are unable to find grounding in the Capital Budget for a definition different from the common meaning of the term.
[9] We do not second-guess the Legislature's decision to grant OFM the authority to determine the appropriate amount of any financing contract. OFM possesses budget expertise by virtue of its role as the Governor's budget office. In addition, OFM possesses the expertise to conduct valid comparisons between the cost of contemplated projects and other capital facilities by virtue of its responsibility for overseeing state capital expenditures. See generally RCW 43.88; Laws of 2007, ch. 506. Because 63-20-financed projects are not designed in advance, their cost cannot be determined with precision at the time their financing is legislatively authorized.
[10] Comments received from DIS support this conclusion. In a memorandum to this office, DIS explains that "[W]hile there is private market data available for office buildings in Thurston County, there is no such data available for data centers. Data centers are a particular component of the commercial development market, and are being built and managed by specialty developers in a limited number of places in Washington State which do not include Thurston county." DISComments, at 1-2 (Attachment B).
[11] Such limits may have come into play in connection with the proposal for the Wheeler Block project. We understand that having reviewed the cost estimates for the project as originally planned, DIS has decided to reconfigure the project in order to reduce its cost.
[12] Your letter also asks whether the Capital Budget's requirement that OFM certify that "all requirements of this subsection (8) have been satisfied" includes a requirement that OFM certify that the State Finance Committee is "reasonably certain that the financing contract is excluded from the computation of indebtedness" as provided for later in subsection (8). By virtue of the structure of the language in the Capital Budget and, more substantively, for the reasons discussed below, we do not believe that the Legislature intended OFM to certify the State Finance Committee's state of mind with respect to a legal question or otherwise to assume any of the Finance Committee's responsibilities.
[13] The State Finance Committee, of which the state Treasurer serves as chairman, has approval authority for certain financing contracts and the issuance of certificates of participation, as well as for the issuance of state bonds, notes, and other evidences of indebtedness.See generally RCW 39.94, 39.42. The state Treasurer's duties include, among others, cash management, custody and disbursement of state and other public funds, investment of certain funds, and accounting for such activities. See generally RCW 43.08, .88.160(5). In carrying out its duties under RCW 39.94, the state Finance Committee "may consult with representatives from the department of general administration, the office of financial management, and the department of information services." RCW 39.94.040(2).
[14] The Legislature's own prior practice with respect to similar certifications indicates that it does not intend legal consequences to attach any alleged inaccuracy. For example, in the budget authorization for the Tumwater Office Building, OFM was required to certify that certain requirements contained therein had been met. Laws of 2001, 2d Sp. Sess. ch. 8, § 172. We are aware of no assertion that such certification gave rise to private legal rights, and for the reasons discussed above, we would find such an assertion groundless. Moreover, in other contexts, the Legislature has indicated that inaccuracies contained in representations that are made by OFM for the Legislature's benefit do not have legal consequences. See RCW 43.88A.900 (providing that requirement for OFM to prepare fiscal notes pursuant to RCW 43.88A
shall not prevent the Legislature from acting on bills or resolutions, "nor shall the lack of any fiscal note as provided in this chapter orany error in the accuracy thereof affect the validity of any measure otherwise duly passed by the legislature." (Emphasis added.)
[15] The overwhelming majority of cases and opinions that have addressed the issue of whether financing contracts or other obligations that are subject to legislative appropriation create debt, and which have been decided or rendered since the Ecology decision, have reached similar results. Fults v. City of Coralville, 666 N.W.2d 548 (2003);Lonegan v. State, 176 N.J. 2, 819 A.2d 395 (2003); In re OklahomaCapitol Imprv. Auth., 1998 Ok. 25, 958 P.2d 759 (1998); In reAnzai, 85 Hawai'i 1, 936 P.2d 637 (1997); Carr-Gottstein Props. v.State, 899 P.2d 136 (1995); Wilson v. Kentucky Transp. Cabinet, 884 S.W.2d 641 (1994); Schulz v. State, 84 N.Y.2d 231, 639 N.E.2d 1140,616 N.Y.S.2d 343 (1994); Dieck v. Unified School Dist. of Antigo,165 Wis.2d 458, 477 N.W.2d 613 (1991); Op. Att'y Gen. L-02 (N.D. 2005),2005 WL 89059; Op. S.C. Att'y Gen. October 6, 2003, 2003 WL 22378706; Op. Att'y Gen. 005 (Wyo. 1998), 1998 WL 102214. But see Dykes v. Northern VirginiaTransp. Dist. Comm'n, 242 Va. 357, 411 S.E.2d 1, rehearing denied (1992) (holding that "practical effect" of non-appropriation would be "calamitous event" and thus obligation created debt); Op. Att'y Gen. 94-101 (Ark. 1994), 1994 WL 410484 (opining that Arkansas Supreme Court has sided with "minority" view that non-appropriation clause does not preclude creation of debt for constitutional purposes).
[16] The 2001 Capital Budget contained the initial authorization for GA to lease develop or lease purchase an office building in Tumwater. That language provided, in part, as follows:
 The following agencies may enter into financial contracts, paid from any funds of an agency, appropriated or nonappropriated, for the purposes indicated and in not more than the principal amounts indicated, plus financing expenses and required reserves pursuant to chapter 39.94 RCW.
 . . . .
 (2) Department of general administration:
 . . . .
 (c) Enter into a financing contract for an amount approved by the office of financial management for costs plus financing expenses and required reserves pursuant to chapter 39.94 RCW to lease develop or lease purchase a state office building of 150,000 to 200,000 square feet on state-owned property in Tumwater according to the terms of the agreement with the Port of Olympia when the property was acquired or within the preferred development/leasing areas in Thurston county. The building shall be constructed and financed so that agency occupancy costs will not exceed comparable private market rental rates. The comparable general office state rate shall be calculated based on the three latest Thurston county leases of new space of at least 100,000 rentable square feet adjusted for inflation as determined by the department of general administration. The department of general administration shall coordinate with potential state agency tenants whose current leases expire near the time of occupancy so that buyout of current leases do not add to state expenses. The office of financial management shall certify to the state treasurer: (i) The project description and dollar amount; and (ii) that all requirements of this subsection (2)(c) have been met.
Laws of 2001, 2d Sp. Sess., ch. 8, § 907.
[17] See Anderson v. Seattle, 78 Wn.2d 201, 471 P.2d 87 (1970) (where Legislature has placed its own construction on a prior enactment, courts are no longer at liberty to speculate on legislative intent); State v.Conte, 159 Wn.2d 797, 154 P.3d 194 (2007) (for purposes of statutory construction, Legislature is presumed to have full knowledge of existing statutes affecting matter upon which they are legislating).
[18] This conclusion is consistent with informal advice previously given by this office of which you are aware. See 63-20 Report, at 28 (noting conclusion of Attorney General's Office that 63-20 financing in compliance with applicable requirements for issuing 63-20 bonds and entering into and authorizing financing contract creates limited obligation similar to obligations created under financing contracts under which COPs are issued and thus, based on State Finance Committeev. Department of Ecology, resulting limited obligation is "outside the definitions of debt authorized in Article VIII of the Washington State Constitution"), 17 (noting "non-appropriation" character of financing contract obligation discussed in State Finance Committee v. Departmentof Ecology, as contrasted with obligation to appropriate funds under scheme discussed in State Building Financing Authority v. Yelle, "may exist both for COPs and for 63-20 bonds supported by a financing lease under Chapter 39.94 RCW, but only if the terms of the financing lease are properly structured").
[19] In very limited situations, a few projects have been found to be public works when there have been attempts to disguise the essentially public nature of a project as private in form. See, e.g., AGO1988 No. 17.
[20] The Court mentions, but does not discuss, the "or which is by law a lien or charge on any property therefore" clause of RCW 39.04.010 that was the basis of the conclusion in AGO 1983 No. 2. Molvik,107 Wn.2d at 28. One can reasonably infer that the Court was essentially validating the reasoning of that opinion, i.e., the fact that a housing authority's construction project is federally funded does not negate the "lien or charge" clause of the definition of "public work" which may apply even where a project is not "executed at the expense of the state [or other covered entity]". RCW 39.04.010(4).
[21] In this vein, the Court of Appeals cited favorably toLycoming County Nursing Home Association v. Pennsylvania Prevailing WageBoard, 627 A.2d 238 (1993). In that case, the Pennsylvania Commonwealth Court held that a project paid for by a county-created non-profit corporation with county-loaned proceeds of county general obligation bonds constituted a "public work." In so holding, the court stated that, "The definition for `public work' does not require that a `public body' must be directly involved with the project; only that the project must be paid for in whole or in part with public funds." Id. at 242. The Court of Appeals found this analysis persuasive, as noted above.
[22] "Public work" is not defined in Texas statute. The trial court held that the subject project was a "public work," although the Court of Appeals' decision contains no discussion of the trial court's reasoning. The City of San Antonio appealed this portion of the trial court's decision. The Court of Appeals held that, given its disposition of the case, it was not necessary to determine whether the trial court's conclusion regarding the project's "public work" status was correct.San Antonio, 224 S.W.3d at 751 n. 5.
[23] The court declined to determine whether the pledged taxes were "public funds" given its conclusion that the project in any event was not construction "paid for in whole or in part" from such funds. SanAntonio, 224 S.W.3d at 751.
[24] This conclusion is one which you apparently anticipated. See63-20 Report, at 4 (63-20 financings used because they "permit state agencies to construct state buildings with tax-exempt financing free from the constraints of public works laws"), 9 ("state agencies are currently able to use 63-20s to free themselves from the constraints of public works laws"), 32 (noting that private nonprofit issuing bonds under 63-20 financing "is not subject to public works laws"); State of Washington Office of the Treasurer, May 22, 2008 Press Release, at 1 (Treasurer's description of Wheeler Block project as being "financed in a way that makes it exempt from public works laws"). As you have noted, whether such a result represents the best possible public policyfor the state of Washington is a matter appropriately for the Legislature to consider. See 63-20 Report, at 49. We note that in the case of the Wheeler Block development, DIS used a competitive solicitation to select a developer. See RFP. In addition, prevailing wages will have to be paid in connection with the construction of the project. See RCW 39.04.260 (work that state or municipality causes to be performed by private party, through contract to rent, lease, or purchase at least fifty percent of project by one or more state agencies or municipalities, shall comply with RCW 39.12 ("Prevailing wages on public works")).
[25] Although the Texas statute at issue in San Antonio Building is phrased somewhat differently than Washington's public works statute, there is a parallel between the Texas statute's "paid for in whole or in part from public funds" language and the "executed at the cost of the state" language in RCW 39.04.010. Under the Texas Court of Appeal's reasoning, because the city was not liable for the developer's default, the fact that assertedly public funds might eventually flow downstream through the developer to help pay bondholders does not mean that the project was constructed using public funds. Applying this reasoning to 63-20 financings, projects constructed by developers — who secure their own construction financing and whose defaults do not flow through to state lessees — are not "executed at the cost of the state." The fact that the state leases the building from the developer, and thus public funds eventually flow through the developer to allow it to repay its construction lenders, does not change the fundamental fact that it is the developer (and not the state) that finances and assumes the risk of construction. Cf. Lycoming,627 A.2d 238 (1993) (holding that county-created nonprofit corporation, which was loaned construction funds from proceeds of county general obligation bonds, and any default for which county was liable was "alter ego" of county and thus construction of facility was "public work" where such defined to mean "construction . . . paid for in whole or in part out of the funds of a public body").
[26] Because the project is owned by the developer, any lien upon the project is not "by law a lien or charge on any property" of the state as contemplated in RCW 39.04.010(4). See RCW 60.04.021 (providing that person furnishing labor, materials, etc. for improvement of real property shall have lien upon improvement for such labor or materials "furnished at the instance of the owner, or the agent or construction agent of the owner") (emphasis added). See also Letter from Joel N. Bodansky, Esq. to Deputy Solicitor General James Pharris (Aug. 22, 2008), at 4 ("Re: Comments on Opinion Docket No. 08-07-03") (explaining that construction of 63-20 financed projects is not "public work" in part because "[t]he nonprofit entity's interest as tenant under the ground lease from the state may be subject to a mortgage or deed of trust, but the state's underlying fee simple ownership interest in the property remains unencumbered" and thus project is not "a lien or change on any property" of the state).
[27] Your question regarding the applicability of public works laws is specifically framed with reference to the Wheeler Block project. Accordingly, our opinion should not be read as a commentary on, or analysis of, the authority of local jurisdictions to pursue capital projects or of legal issues that may arise in connection with such projects.